[Crim. No. 13242.   Second Dist., Div. Five.   Mar. 12, 1968]

THE PEOPLE, Plaintiff and Respondent, v. KENNETH EUGENE BLACKBURN, Defendant and Appellant.

Russell E. Parsons for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip M. Rosten, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—A jury convicted defendant on all counts of a five-count information.[1] With respect to each count the information alleged that defendant was armed with an automatic pistol and the jury found said allegations to be true. Later, a motion for a new trial was denied and defendant was sentenced to state prison. The sentences on counts I, II, III, IV and V were ordered to run concurrently, but execution on counts II and III was "suspended" pending determination of any appeal on counts I, IV and V.[2]

On appeal it is urged that the identification of defendant as the person who committed the crimes in question was insufficient to support the verdicts. In addition, it is claimed that his Sixth Amendment right to counsel was violated when he was put through lineups without counsel and that he was denied due process by unfair extrajudicial identifications.

[1] In action number 324819 defendant was charged with robbery (Pen. Code, § 211) and two counts of kidnaping for the purpose of robbery (Pen. Code, § 209). The date of these offenses was alleged to be April 13, 1966. In case number 324817 he was charged with kidnapping for the purpose of robbery (Pen. Code, § 209) and robbery (Pen. Code, § 211). the date alleged was March 30, 1966. On August 2, 1966, the two informations were consolidated and the three counts in 324819 became counts III, IV and V of case number 324817.

[2] It is apparent that the trial court attempted to follow the procedure authorized by *People* v. *Niles*, 227 Cal.App.2d 749, 754-756 [39 Cal.Rptr. 11]. The court did not, however, order that the stay on counts II and III become permanent at the completion of the sentences on counts I, IV. and V. At the end of this opinion we shall order the judgment modified accordingly.

FACTS

The case is a little unusual in this: while the identification of defendant is actually very strong, so are his alibis, at least with respect to April 13, 1966. (Counts III, IV and V.) Nevertheless we feel that the evidence amply supports the verdicts with respect to each date.

### The Events of March 30, 1966.

At about 8 p.m. somebody relieved Mrs. Leona Kates, who lived at 701 North Oakhurst in Beverly Hills, of about $30,000 worth of jewelry. In the course of the robbery— during which the robber forced Mrs. Kates and her house-keeper, at gun point, to go upstairs from the ground floor— the robber wore a fake nosepiece, fake eyeglasses and a black moustache which was attached to the nose. Nevertheless, according to Mrs. Kates, "quite a bit of his face was exposed." It was a distinctive face. The skin was very light and the robber had blond hair. The housekeeper saw defendant for a few seconds without his disguise. During the course of the robbery both women had ample opportunity to observe the robber and to listen to his voice. At the trial both women positively identified defendant as the robber.

The night of the robbery Mrs. Kates looked through several mug books at the Beverly Hills police station but did not see any picture which looked like the robber. Several times thereafter officers visited her house and brought her more pictures. She was unable to identify the robber from any of those pictures until one visit when she was shown defendant's photographs. "When I saw those, I knew immediately this was the man." On that occasion the police had two or three pictures of the defendant. There were pictures of two or three other persons that were shown her then.[3]

During the period before Mrs. Kates picked out defendant's picture she had seen several lineups without success. After her recognition of the photograph she picked defendant out of a lineup. Four or five other persons were in the lineup. Defendant was asked to speak and she recognized his voice. There was no doubt whatever in her mind that defendant was the robber and kidnapper, in spite of the glasses, the false nose and the moustache. Mrs. Kates could not recall what the

---

[3] On cross-examination she testified that there were "four or five or three or four" pictures of defendant and, as she remembered it, "there were other photographs with it, maybe one or two." At the preliminary hearing she had made a statement which could be interpreted to mean that no pictures other than those of the defendant were shown to her.

others in the lineup looked like. Although she looked at them she did not have to look at them long, because she saw the one that she knew.

The housekeeper, Betty Filmore, too went to the police station the night of March 30, 1966, and looked at photographs without being able to identify the robber. Three or four additional visits to the station were unsuccessful. Apparently, during those visits the police had also attempted to have her identify the robber in lineups but she could not do so. A detective brought various photographs to the house on several occasions. Finally he came with three or four pictures of the defendant whom she then identified. She too picked defendant out of a lineup at the police station.

During cross-examination, Miss Filmore stated that none of the other three persons in the lineup with defendant looked anything at all like the defendant.

On redirect this conclusion was explained as follows: the other participants in the lineup were all white, like defendant. She could not say whether any of the others had blond hair. She did not notice their hair. She did not look at the lineup for any length of time before picking out defendant because "When he walked through that side door, the first thing I spotted, I knew it was him. I knew it was the man that was at the door that night." Her identification was based on the fact that she had seen him at the Kates' home that night, not on the pictures she had been shown.

Mrs. Treadway was a housekeeper employed across the street from the Kates' residence and was visiting her friend, Mrs. Filmore, the night of the robbery. The two were together in Mrs. Filmore's room watching television when Mrs. Filmore left to answer the door. Mrs. Treadway continued to watch television while Mrs. Filmore was gone. She happened to look out the window and saw a red car with a light canvas top pulling away fast.

When Officer Mourning arrested defendant on April 26 he observed defendant's 1964 red Pontiac which, according to him, had a white canvas hard top. Later evidence established pretty conclusively that the top of the car, while light, was metal and not canvas. A photograph, which is in evidence, indicates to us that Mrs. Treadway's error, at night, is understandable.

### The Events of April 13, 1966.

The victim, on April 13, 1966, was a Mrs. Katherine Goldberg, a widow, who lived at 701 North Arden Drive, Beverly

Hills, with her 16-year-old son. She had a house guest, a Mrs. Caplow, who lived in Chicago. Some time between 1:15 and 1:30 in the afternoon a person appeared at the front door wearing dark glasses and a "big bushy moustache." He gained entrance by stating that he and undisclosed other persons were holding Mrs. Goldberg's son for ransom. He demanded: "Take me to your jewelry." At gun point, Mrs. Goldberg and her guest were forced upstairs to the safe where Mrs. Goldberg kept about $45,000 to $50,000 worth of jewelry. It was apparent that the robber knew about the safe, which was concealed. Again both ladies had plenty of opportunity to observe the robber. Both made positive courtroom identifications of defendant.

Mrs. Goldberg was shown photographs at the police station on the day of the robbery but did not recognize the robber. Eventually, at her home, she was shown a photograph of defendant. This was after she had been shown so many other photographs she "couldn't possibly count the many I saw." Thereafter she picked defendant out of a lineup. There were three other Caucasians in the lineup.

Cross-examination developed the following: At the time of the robbery defendant had dark hair.[4] The first pictures that she was shown which had defendant in them were not mug shots, but were in a "personal-type album." Defendant was shown standing in front of a home with his foot on a pickup truck. She said: "This is the man." There were pictures of females in the album and of others who appeared to be friends. She could not recall whether she recognized the pictures before or after the lineup.

On the day of the robbery Mrs. Caplow had looked through some mug photos at the Beverly Hills police station, but without success. Later, in Chicago, F.B.I. agents showed her photographs which, she supposed, were mug photos "but they weren't any of the ones I had seen at the station. They were little snapshots." One day the F.B.I. agents brought two photographs from which she was unable to make an identification. Another day, later, they brought three and she identified defendant that day. One other person was shown on one

---

[4]To make a long story short: the People produced two photographs, apparently taken the Christmas before, showing defendant with dark hair. There is testimony from defendant that the photographs do not give a correct interpretation of the color of his hair and that two apparently dark blond women on one of the pictures are really platinum blondes. This, of course, only created a conflict. At the time of the arrest defendant was blond.

photograph. Cross-examination with respect to the witness' Chicago identification confused the picture. It went as follows: "Q.—this photograph that was shown to you in Chicago— A. Yes sir. Q.—where you saw the defendant, that was a photograph, as you indicated, with someone else in the photograph? A. Yes, one of them, uh-huh. Q. This was not, in other words, one of these mug shots where someone is arrested and they put them there? A. No, it was not. Q. As a matter of fact, you saw no such photograph of that type, of the defendant? A. No, sir."

The above passage is fairly typical of the vagueness of the evidence concerning the extrajudicial identifications from the point of view of whether they were fairly conducted. Thus, in connection with Mrs. Caplow's contacts with the F.B.I. in Chicago one would like to know such matters as: Was there a separate photograph of the "one other person" or did Mrs. Caplow only refer to the person shown together with defendant in one picture? Was the "other person" a man or a woman? If it was a man, did his appearance differ markedly from that of defendant?

Just before the trial Mrs. Caplow was shown five mug shots and identified one of defendant as that of the robber.[5] She had met a man shown in one of the other photographs at Mrs. Goldberg's two or three days before the robbery.

Mrs. Goldberg was then recalled by the People and testified that the man in question was one Chet Gray who had been at her home both before and after the robbery. She had met him through his former mother-in-law who apparently was a friend of hers. The last time he had been at her home before the robbery, was on the preceding night. His wife was along. Mrs. Goldberg was upstairs, dressing. Mrs. Gray came upstairs. The door of the jewelry safe was open. Mrs. Gray said: "Oh my God, I didn't know you had so much jewelry. I didn't even know you had a safe."

Later in the trial defendant testified that he had known Chet Gray casually since "around the first of the year"— presumably 1966. He met him again in February and once more in March. It was also "very possible" that he met him around March 29 or 30 and he believed that he also met him in April. During the meeting around March 29 there was no

---

[5]These mug shots are in evidence and show defendant, three other males and one female. The five subjects were arrested together. We have looked at the photographs. There was nothing unfair in selecting that group of pictures for the identification.

conversation concerning jewelry or Mrs. Goldberg.[6] Gray was apparently arrested at the same time as defendant.

## Defendant's Admission

The investigating officer for the Beverly Hills Police Department was Jack R. Mourning. He had arrested defendant on April 26, 1966, and given him a then adequate warning of his constitutional rights.[7] On June 29, 1966, word reached him that defendant, then at the county jail, wanted to talk to him. He went there in the company of Lieutenant Cork. Lieutenant Cork asked defendant why he wanted to see him. Defendant said that he had heard that the officers were interested in recovering the jewelry involved in the robberies. Lieutenant Cork asked him whether he had discussed this matter with his attorney. Defendant said that he had not, but that he did not feel that it was necessary. He said that in his opinion one Allen Lowe, a receiver of stolen property and "finger man," well known to the police, had the jewelry. He thought that it would be difficult for police officers to recover it but that he might be able to do it if his bail were reduced and he could be released. Lieutenant Cork then informed defendant that in his opinion it was best to have an attorney present during any conversations on that subject and the interview ended.[8]

## Defense

The defense consisted of two elaborate alibis. The one with respect to the Kates robbery pretty well collapsed. Essentially, defendant's story was that at the time of the robbery he was miles away, in Reseda, negotiating for a new set of tires with an old friend, one Earle Stratford, who operated a Tidewater Associated service station. He also lubricated his car there. This evidence was corroborated by Stratford, who among other things, produced a copy of a credit card invoice showing the purchase of certain oil and gasoline products by defendant. On rebuttal the People called a credit man for the Phillips Petroleum Company, who had access to the records of the Tidewater Company. Without going into detail, his testimony strongly supported the conclusion that the serial number on the invoice was part of a series of invoices delivered to

---

[6]Obviously the prosecutor inquired concerning the wrong meeting.

[7]The case went to trial in August, 1966, after the decision in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[8]The admission of this evidence is not challenged on appeal.

Stratford, but none of which were used by him until April 20, 1966. At the time of the Kates robbery Stratford was using invoices from an entirely different series.

The alibi for the time of the Goldberg robbery was more convincing. Defendant, his mother and two May Company salesladies testified that at the critical time defendant was at the May Company at Topanga Plaza inspecting the prints of a photograph of his parents which had been ordered on an earlier date. There was fairly remarkable unanimity among the witnesses. The prosecutor was not too successful in breaking them down. He did, however, succeed in casting doubt on the alibi in two respects:

1. According to Mrs. Huber, one of the two salesladies, when defendant and his mother came in, Mrs. Larmon, the other saleslady, had left for lunch. Mrs. Larmon came back at about 1 :40 p.m. Then she and Mrs. Huber talked to defendant and his mother "for awhile" before Mrs. Huber went to lunch, which was a little after 2 p.m. This was after defendant and his mother had left.

Mrs. Huber's time card showed that she actually went to lunch at 3 :50 p.m. If that time was correct the entire visit to the May Company could have taken place well after the robbery of Mrs. Goldberg had been completed.

2. On April 2, Mrs. Blackburn had looked at a set of prints and had not liked them. On April 5 the prints had been returned to New York for further processing. According to Mrs. Huber it took at least a week and a half for prints of the type that had been ordered to return from New York. These particular prints were returned to the May Company on the Saturday before the defendant and his mother came to inspect them. The day they came back Mrs. Huber called Mrs. Blackburn to tell her and she came in the following Wednesday, which, the witness insisted, was April 13, 1966. In other words, if the witness was correct with respect to the date when defendant was in the store the minimum time of one week and a half had shrunk to the extent that she mailed the prints to New York on Tuesday April 5 and that they were returned, processed, on Saturday, April 9.

In all fairness, the other saleslady, Mrs. Larmon stood up well and if she was believed, defendant most certainly was not at 701 North Arden at 1 :30 p.m. on April 13, 1966.

## DISCUSSION

Defendant claims that his identification by Mrs. Kates and her housekeeper was "erroneous and incredible and

cannot stand against the positive testimony of the defendant . . . combined with a clear showing of his alibi . . .'' This is followed by a long factual argument, during which defendant must admit that the housekeeper, at least, got a good if brief look at him when he first appeared at the door, before he put on his nose and moustache. This alone is sufficient to support the verdict on counts I and II. (*People* v. *Alexander*, 78 Cal. App.2d 954, 956 [178 P.2d 813].)

Defendant emphasizes the many photographs that were shown to the witnesses and the several lineups which they went through before they were able to identify defendant. Unfortunately, from his point of view, there is no evidence at all that any picture of him was included among those which they could not identify or that he was in any lineup before the one which was successful. Furthermore, we cannot go along with the implied assumption that the identification of defendant became impossible, as a matter of law, once he had disguised himself. The witnesses had plenty of time to note features which were not hidden. Finally, there was a lot of conversation at the time of each robbery and, it will be recalled, Mrs. Kates recognized defendant's voice when he spoke at the lineup.

Defendant makes pretty much the same argument with respect to the identification by Mrs. Goldberg and Mrs. Caplow. Again there is the suggestion that identification became impossible once he had put on sunglasses and the bushy moustache. We have heretofore rejected the point.

The identification evidence is more than adequate.

It is, of course, also noted that the remarkable similarity of the *modus operandi* on each occasion indicated that the person who committed one set of crimes, also committed the other.

Defendant attacks the photographic and lineup identifications on constitutional grounds. As far as the absence of counsel is concerned, he cannot complain because of the time element involved. (*People* v. *Feggans,* 67 Cal.2d 444 [62 Cal.Rptr. 419, 432 P.2d 21].) He does, however, have standing to claim that due process was violated if the extrajudicial identifications were "unnecessarily suggestive and conducive to irreparable mistaken identification." (*Stovall* v. *Denno,* 388 U.S. 293, 299-302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].)

We have set forth the evidence with respect to the extrajudicial identifications at some length. There is no point in repeating it. At most it can be said that there are certain details with respect to the various identifications concerning

which there is no positive testimony, which testimony might disclose unfairness, were it part of the record.

Perhaps there is nothing further counsel could have elicited from the witnesses which might have shed more light on the fairness of the various identifications, but certainly there were witnesses, such as police officers, who were never produced, who might have made a contribution.

If the rule of *Stovall* v. *Denno, supra,* decided after the trial of this case, were the first to furnish a motive for going into the details of extrajudicial identifications, we should perhaps give defendant another opportunity to establish unfairness. Yet, all that *Stovall* did was to change the effect of unfairness. Before that decision it went only to the weight of the evidence (*People* v. *Diaz,* 66 Cal.2d 801 [58 Cal.Rptr. 729, 427 P.2d 505]; *People* v. *Parham,* 60 Cal.2d 378, 380 [33 Cal.Rptr. 497, 384 P.2d 1001]), now it goes to admissibility (*People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]).

The commission of the crimes by somebody was not challenged by defendant. The identity of the robber was the only issue tried. The necessity of discrediting the identifications could not have been stronger. Everything depended on it. Defendant's counsel was obviously alert to the situation. We have no reason to believe that, at a retrial, defendant could do any better.

Although defendant's counsel was not obligated to anticipate *Stovall* by objecting to the evidence of extrajudicial identifications (*People* v. *Kitchens,* 46 Cal.2d 260, 262-263 [294 P.2d 17]), error will not be presumed on appeal and, in the absence of contrary evidence, unfairness must not be assumed. (*People* v. *Citrino,* 46 Cal.2d 284, 287 [294 P.2d 32]; *People* v. *Farrara,* 46 Cal.2d 265, 269 [294 P.2d 21].) It should be remembered that the police, too, had a strong interest in fair identification proceedings. They had apparently caught a rather large fish and presumably did not want to see it get off the hook by having a jury believe that a bunch of women had been hoodwinked by the authorities.

■ The Attorney General has drawn our attention to the imperfection in the judgment adverted to in footnote 2 of this opinion. The trial court realized that because of the provisions of section 654 of the Penal Code defendant could not be punished on counts II and III, the robbery counts. (*People* v. *McFarland,* 58 Cal.2d 748, 760-763 [26 Cal.Rptr. 473, 376 P.2d 449].) On each occasion all of the defendant's acts were "incident to one objective."

In addition there is an ambiguity in the judgment. In view of the kidnaping conviction it is probably quite academic. After reciting the jury verdicts on both the kidnaping and robbery counts, the judgment further recites: "and that defendant was armed as alleged." The information alleged with respect to each count that defendant was armed "with a deadly weapon, to wit, an automatic pistol." Since being armed with a deadly weapon was the element of the robbery counts which made the crimes robberies in the first degree, as found by the jury, this recital must be disregarded as far as those counts are concerned. (*People* v. *Sparks,* 257 Cal.App. 2d 306, 312 [64 Cal.Rptr. 682].)

The judgment is therefore modified to read as follows:

"Whereas the said defendant having been duly found guilty in this court of the crime of KIDNAPING FOR THE PURPOSE OF ROBBERY (Sec 209 PC), a felony, as charged in each of the Counts 1, 4, and 5 of the information; ROBBERY (Sec 211 PC), a felony, as charged in each of the Counts 2 and 3 of which the Jury found to be Robbery of the first degree and that defendant was armed as alleged *in Counts 1, 4, and 5.*

"It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term prescribed by law, on said Counts. Sentences as to Counts 1, 2, 3, 4 and 5 are ordered to run CONCURRENTLY with each other.

"Execution of sentences as to Counts 2 and 3 is *stayed* pending determination of any appeal on the other Counts, *such stay to become permanent when the sentences on Counts 1, 4 and 5 are completed.*"

As thus modified the judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.