[Crim. No. 27492. Second Dist., Div. Five. Aug. 19, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE VANBUSKIRK, Defendant and Appellant.

**COUNSEL**

Marshall L. Barth for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet H. Swoboda and David R. Chaffee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant George Vanbuskirk was charged with one count of robbery and one count of burglary, both counts arising out of the same event. After a jury trial, defendant was found guilty on both counts; the jury found each offense to be of the first degree. Defendant was sentenced to prison; execution of sentence on count II was suspended.

FACTS

At about 9 p.m. on August 15, 1974, a robbery occurred at a 7-11 Store. The three chief prosecution witnesses were in the store at the time of the robbery: Robert King, age 18, who was working in the store; Kevin Ferguson, age 17, who was helping him; and Dale Horning, age 14, who had come by to visit them. King was behind the cash register, Horning was to his left, several inches away, and Ferguson was seated in a chair in the cash register area behind them about two feet away.

A number of customers were waiting to check out at the register. King first observed the robber when he approached Ferguson and asked him for a cigarette. During a period of about 15 to 20 minutes, the robber shopped, picking up items which he brought to the cash register and

counter area. After several trips, the robber got in line to check out and when he got to the register, he handed King a note which said: "This is a holdup. Give me all your money." The robber had a supermarket bag over his right hand, the bottom of which was pointed at King. He handed King the note with his left hand. When King read the note, he started to remove the bag from the right hand of the robber who told him to put the money in another bag. King then took a bag from under the counter and put the money into it. He handed it to the robber, who took the bag, put it under his arm and remained in the store for several minutes.

The robber then walked out of the store and walked along the front of the store. He was observed by King and Horning until he reached the corner of the store where he apparently turned north. Horning followed him out of the store and observed him walk toward the back of the building and out through an opening in a six-foot wall behind the store. Horning saw the robber fling the brown paper bag from his right hand at which time he saw a .38 caliber handgun in the robber's hand. Horning then went back to the 7-11 Store, took his bicycle, rode to the end of an alley adjoining the rear of the store and stationed himself at that point. He saw an automobile coming toward him and recognized the driver as the robber. He memorized the license plate and a description of the vehicle and then went back to the store where he wrote down the number and description on a scrap of paper.

The police department was called. Shortly thereafter two police officers arrived and took a report from King, Ferguson and Horning. The officers were given a description of the suspect and a description of the automobile and the license plate number. The suspect was described as having a moustache. The officers then ran a make on the license number they had been given and found that the automobile involved was registered to defendant.

On August 22 defendant was arrested at his place of work. He was given his *Miranda* warnings and agreed to talk to the police, but was not interrogated at that time. He consented to a search of his car and apartment; no evidence was found. Several hours later, the officers took defendant to the police station, where he was interrogated. He gave an account of his whereabouts at the time of the robbery, which was inconsistent with his alibi defense presented at the trial.

King, Ferguson, and Horning made pretrial photographic identifications of defendant. The evidence concerning the circumstances under which these identifications were obtained was in conflict.[1]

The prosecution version was that Douglas Mahoe, the investigating officer showed a set of six pictures—the "first" set—to all three witnesses on August 21. He first showed it to Horning at the 7-11 Store, later to King and Ferguson at the home of King's girl friend. All the subjects in this first set were clean-shaven—no beards or moustaches. This first set did not contain a picture of defendant. None of the three was able to make an identification. The pictures that were contained in the first set could not be located or identified at the time of trial.

The next day he brought a second set to King and Ferguson.[2] This set did include a picture of defendant. Officer Mahoe showed the set to King in the kitchen, after asking Ferguson to step into the living room. King promptly picked out defendant's photograph and signed it on the back. This procedure was then repeated with Ferguson, while King was in the living room. Mahoe then arrested defendant and later that day showed the second set to Horning at his home. Horning, too, picked out defendant's picture and signed it.

This evidence was, however, not uncontradicted. Ferguson testified on direct examination that he was in the same room, only a few feet away from King, watching what King was doing, when King picked out and signed defendant's photograph.

Although the direct examination of Horning generally agreed with Officer Mahoe's recollection of events, cross-examination revealed substantial contradictions, together with evidence pointing to unfairness. First, at the preliminary hearing Horning had testified that he identified defendant at his home from the first—and only—set of photographs he was shown. Second, the set shown to him contained several pictures of men who were clean-shaven or had beards.[3] When Officer Mahoe showed him the photographs, he asked: "Which man is the man that came in the store that night?"

---

[1]Most, but not all, of the contradictory evidence was developed on cross-examination.

[2]This second set was introduced in evidence. It is undisputed that it is a fair photographic lineup.

[3]This would mean, of course, that he did not identify defendant from the second set, an "all moustache" lineup, nor from the first set as described by Mahoe.

At the trial, all three witnesses made courtroom identifications of defendant. Further, the prosecution took full advantage of section 1238 of the Evidence Code, and proved their pretrial identifications.

## DISCUSSION

*Photographic Identification*

■ At trial, defense counsel objected to the identification of defendant by the first prosecution witness, Robert King, on grounds that any identification had been tainted by an improper photographic identification. Defense counsel asked the court to make a determination "with respect to the admission of in-court identification and the line-ups of the photo."

The prosecutor objected, asserting—erroneously, as the People now concede—that defendant "could have had a motion under 1538.5 to suppress those photographs, and that since he did not do so, he's precluded at this time from bringing up alleged tainted photographs or methods by which the photographs which the People will in due course lay foundation for to be brought before the jury." The court agreed. It ruled that all the defense could do was to cross-examine the prosecution witnesses concerning the "manner in which the photographs were shown"—presumably to affect the weight of their testimony.

The court's ruling left no doubt that it would not consider any unfairness in the photographic identification procedures as affecting the admissibility of the witnesses' courtroom identifications, or of evidence of their pretrial selections of defendant's photograph.

That this was a most fundamental error cannot be doubted and is, as noted, conceded. ■ Defendant was entitled to challenge the witnesses' in-court identifications by an objection made at the time the evidence was offered. (*People* v. *Martin,* 2 Cal.3d 822, 832, fn. 11 [87 Cal.Rptr. 709, 471 P.2d 29]; *People* v. *Dewberry,* 40 Cal.App.3d 175, 184 [114 Cal.Rptr. 815]; *People* v. *Smith,* 273 Cal.App.2d 547, 552 [78 Cal.Rptr. 405].)

Moreover, since it was the avowed intent of the prosecution to offer evidence of the pretrial photographic identifications, it was its burden to lay a foundation by establishing, as a fact, the fundamental fairness of the photographic identification procedures. (*People* v. *George,* 23

Cal.App.3d 767, 774 [100 Cal.Rptr. 427].) ▇ The court's erroneous ruling thus deprived the defense of an opportunity to have the court resolve the evidentiary conflict to which we have averted.

That this conflict could have resulted in findings that the prosecution did not sustain its burden with respect to Ferguson and Horning is clear.[4]

As far as Ferguson is concerned, if he had been believed, he saw King select and sign defendant's photograph. Although he was not expressly directed to select the same picture as King, the situation exerted its own pressure that he do so. In any event, his selection of defendant's picture under those circumstances called for a prosecution effort to establish by clear and convincing evidence that Ferguson's in-court identification was based on his observation of defendant at the time of the robbery. (*United States* v. *Wade,* 388 U.S. 218, 240 [18 L.Ed.2d 1149, 1164-1165, 87 S.Ct. 1926]; *People* v. *Martin, supra,* 2 Cal.3d 822, 831.) The prosecution however—erroneously freed of its initial burden—made no attempt whatever to establish that the in-court identification was untainted.[5]

In Horning's case, too, the record contains some evidence of unfairness. If he did not select defendant's photograph from the second set but from the first set, the display may have been rigged against defendant. As noted, there is evidence that the first set contained several pictures of men who were clean-shaven, as well as pictures of men with beards, whereas the robber had been described as having a moustache. All but one or two of the pictures were, therefore, nonstarters. In addition, there is evidence that when Officer Mahoe showed him the set he asked, "which man is the man that came in the store that night"—a question which, under the circumstances, suggested not only that the robber's picture was in the set, but that it was one of the few—possibly only one—pictures of men with moustaches. Finally, if Horning picked defendant from the first set—the set which could not be produced at the

[4]Defendant also claims that the record contains evidence tainting King's pretrial identification. There is evidence in the record that when King picked out defendant's photograph, he had been told that Horning had already identified one of the subjects—a false statement, if Officer Mahoe is otherwise believed. That fact alone, however, would not make King's photographic identification unfair. There is no evidence that Officer Mahoe suggested that it was defendant's picture which had been selected by Horning.

[5]Ferguson did, of course, testify in great detail to his observations at the time of the robbery, but as our Supreme Court stated in *People* v. *Martin, supra,* 2 Cal.3d at 833, this "simply begs the question which the procedures contemplated by *Wade* . . . are designed to answer: How did [his] testimony as to [his] specific observations tend to show that [his] in-court identification was not infected with the taint of the illegal pretrial confrontation?"

trial—that circumstance could have been taken into consideration by the trial court, there being "some evidence that the photographic identification procedure was impermissibly suggestive." (*People* v. *Bethea,* 18 Cal.App.3d 930, 938 [96 Cal.Rptr. 229].)

In Horning's case, too, the People made no effort to shrive his courtroom identification of any possible taint.

The People, citing *People* v. *Enos,* 34 Cal.App.3d 25, 39 [109 Cal.Rptr. 876], urge affirmance of the conviction. In *Enos* as here, the trial court erroneously refused the defense an opportunity to show an unnecessarily suggestive pretrial photographic identification procedure. However, as the court noted, "[n]o claim was made by defense counsel that the in-court identification was tainted by the pretrial procedures, nor is such a claim made on this appeal." The error was, therefore, abstract and harmless beyond a reasonable doubt.

This case is quite different. We do not suggest for one moment that the conflicting evidence compelled trial court findings that the procedures were impermissibly suggestive. The trouble is that since no hearing was held, we simply do not know what the court would have found. Thus, to sustain defendant's conviction, we would have to conclude that the error in permitting evidence of the pretrial identifications of Ferguson and Horning was harmless beyond a reasonable doubt (*Gilbert* v. *California,* 388 U.S. 263, 273-274 [18 L.Ed.2d 1178, 1186-1187, 87 S.Ct. 1951]; *People* v. *Martin, supra,* 2 Cal.3d 822, 831; *In re Carl T.,* 1 Cal.App.3d 344, 353-354 [81 Cal.Rptr. 655]); that, further, those witnesses' in-court identifications were not tainted by the unfair pretrial identification procedures (e.g., *People* v. *Citrino,* 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80])—a point on which there is no evidence whatever—and, finally, that if the in-court identification was tainted, the error in permitting the evidence to be introduced was also harmless beyond a reasonable doubt. (*People* v. *Martin, supra,* 2 Cal.3d 822, 831.) This we cannot do.

Further, in this case at least, it would not be safe to assume that the record reveals all of the evidence pointing to possible unfairness which might have been developed, had the court held an appropriate hearing outside of the presence of the jury. While it is certainly true that the defense was highly motivated to demonstrate unfairness in the pretrial identification procedures for the purpose of belittling the weight of the prosecution witnesses' evidence (*People* v. *Blackburn,* 260 Cal.App.2d 35, 44 [66 Cal.Rptr. 845]), every trial lawyer knows that there are tactical

differences between cross-examining a witness in front of a jury and doing so at a hearing before the court on a preliminary question of fact.[6]

## VIOLATION OF MIRANDA RIGHTS

■ Defendant claims that he should have been readvised of his *Miranda* rights before being interrogated at the police station. We need not decide whether the contention has merit. Defendant never objected when his statement was first introduced by the prosecution. The matter was not raised until much later when the officer in question testified on rebuttal. Any error is therefore unreviewable. (*People* v. *Fain,* 70 Cal.2d 588, 601, fn. 7 [75 Cal.Rptr. 633, 451 P.2d 65]; *In re Dennis M.,* 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Deutschman,* 23 Cal.App.3d 559, 564 [100 Cal.Rptr. 330]; *People* v. *Castro,* 257 Cal.App.2d 643, 645-646 [65 Cal.Rptr. 62].)

Moreover, for reasons which we need not go into, we are quite convinced that counsel's failure to object was a tactical decision, which, as the case developed, backfired.[7] (*People* v. *Caritativo,* 46 Cal.2d 68, 73 [292 P.2d 513].)

### SENTENCING

When defendant was sentenced, the court stated that it "believes there to be a reasonable doubt as to whether or not the defendant was armed or did use a deadly weapon," and struck the jury's "armed" and "use" findings. The court, however, specifically found that the robbery—execution of sentence on the burglary count was stayed—was "still first degree."

There is, therefore, no merit to defendant's contention that the judgment should be modified to delete the findings that the robbery, and

---

[6]The record contains several areas which might have been explored before the court, but which both sides left untouched in front of the jury. For example: the back of the photograph of defendant which all three witnesses eventually selected contains the signatures of King and Ferguson at the top, and that of Horning at the bottom. The two signatures at the top are followed by the date "8-22-74" as is Horning's signature at the bottom. It may well be that further examination of Horning—or possibly of Officer Mahoe—concerning these signatures and dates, might have refreshed the witnesses' recollection and resolved the conflict with respect to the number of sets shown to Horning and the type of pictures they contained.

[7]The statement was: "[Defendant] did not know where he was on August the 15th around 9:00 p.m. He wasn't sure whether he was at home." Defendant also said that "he may have been at the Fire Fly Bar . . . ."

burglary, were of the first degree. Although we decline to hold, as the Attorney General suggests, that the court had no jurisdiction to delete the jury's findings, we conclude that defendant cannot base a complaint on the trial court's generosity.

There remains the question of disposition. Section 1260 of the Penal Code, quoted in the footnote, was amended by the 1970 Legislature by adding the last, italicized phrase.[8] While the added language merely recognizes a power appellate courts have always had and exercised, it does evidence legislative concern with unnecessary retrials where something less drastic will do.. Thus, in *People* v. *MacDonald,* 27 Cal.App.3d 508, 511-512 [103 Cal.Rptr. 726], an otherwise faultless conviction was remanded for the sole purpose of resolving a speedy trial problem. In *In re Wells,* 20 Cal.App.3d 640, 651 [98 Cal.Rptr. 1], the Court of Appeal remanded the matter to the trial court for the sole purpose of taking evidence concerning the constitutionality of the composition of the grand jury that had indicted the defendants. (Cf. *United States* v. *Wade,* 388 U.S. 218, 242 [18 L.Ed.2d 1149, 1166, 87 S.Ct. 1926]; *Jackson* v. *Denno,* 378 U.S. 368, 395-396 [12 L.Ed.2d 908, 926-927, 84 S.Ct. 1774, 1 A.L.R.3d 1205].) ■ What we gather from these authorities is that when the validity of a conviction depends solely on an unresolved or improperly resolved factual issue which is distinct from issues submitted to the jury, such an issue can be determined at a separate post-judgment hearing and if at such hearing the issue is resolved in favor of the People, the conviction may stand.

■ While our opinion has emphasized the conflicts in the evidence which would have justified a finding of unfairness, that was done for the purpose of showing that the denial of a hearing on the issue was error. Nothing we have said should be interpreted to mean that the court, as a trier of the disputed facts, would have been bound to reject the police version of what took place. There is, therefore, a strong possibility that a remand for the sole purpose of conducting a post-judgment hearing may avert the need for a retrial.

At the oral argument of this appeal both sides agreed that if we found that the record contained substantial evidence of unfairness with respect

[8]As amended, section 1260 of the Penal Code, now reads as follows: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial *and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances.*"

to the identifications, but revealed no other error, a remand for the sole purpose of conducting a hearing with respect to the fairness of the identifications would be appropriate. In spite of this concession, we must take note of intimations to the contrary in *People* v. *Martin, supra,* 2 Cal.3d 822, 832. In *Martin,* the trial court had received evidence concerning the circumstances of an unnecessary suggested identification, but had nevertheless allowed the victim to identify the defendant in front of the jury. No evidence that the courtroom identification had an independent origin was ever offered. On the motion for new trial, the trial court announced that the identification had, indeed, violated constitutional standards, but concluded, nevertheless, " 'that the in-court identification by the victim in this case had an independent origin and she also testified as to her specific observations at the time and place of the robbery itself.' " (*Ibid.,* at p. 828.) The Supreme Court said that "the trial court's consideration of the matter of independent origin on the motion for new trial was [not] the legal equivalent of such consideration and determination at trial." (*Ibid.,* at p. 832.) It also held, however, that the trial court's reliance on the victim's " 'specific observations at the time and place of the robbery itself' " begged the question of taint. (*Ibid.,* at p. 833.)

The announced reason for the Supreme Court's first statement, that the matter of independent origin should have been considered at trial, was this: "A trial court ruling on a motion for new trial does so under the influence of what amounts to a presumption in favor of the correctness of the verdict and the proceedings supporting it. [Citations.] Clearly a quite different attitude is required when the court undertakes to determine and assess 'preliminary' or 'foundational' facts upon which the admissibility of evidence depends." (*Ibid.,* at p. 832.)

We do not think this rationale applies here. Any presumption of correctness should be dissipated by this opinion. Nor is there such convergence between the issues remaining to be tried—the fairness of the Ferguson and Horning identifications—and the issues submitted to the jury as there was in *Martin.* There the trial court acted under the spell of a verdict which negated any jury doubt concerning the victim's courtroom identification, yet it purported to determine—using the wrong standard to boot—to what extent the victim's testimony had been influenced by the identification procedure. In this case, the issue to be decided was never submitted to any trier of fact: not to the jury, because it would have been none of its business; not to the court, because it erroneously refused to decide it. In any event, the need for a full factual

hearing on the issue of the fairness of the identification is the same whether we reverse with directions to retry the entire case or remand the matter for a factual hearing the result of which may make a full retrial unnecessary.[9]

The case is therefore remanded with directions to take evidence on the fairness of the Ferguson and Horning identifications and to make findings thereon. If the superior court determines that both photographic identifications were fair, the court shall re-arraign defendant for judgment and pronounce judgment on the verdict. If it determines that either identification was unfair, it shall make an order granting defendant a new trial.[10]

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied September 15, 1976.

---

[9]Though not compelled to do so, the superior court may, of course, think it wise to assign the post-judgment hearing to a judge other than the one who tried the case. (See *People* v. *Charles,* 66 Cal.2d 330, 338, fn. 11 [57 Cal.Rptr..745, 425 P.2d 545].)

[10]We cannot, without abdicating our function, chart any other course for the trial court. Even if the trial court could determine that either or both courtroom identifications were untainted, since at the trial direct evidence of each identification was offered by the People, the error was of constitutional dimensions if either identification was unfair and it is our province, not the trial court's, to determine whether the error was harmless beyond a reasonable doubt.