Filed 1/26/16  P. v. Richmond CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JENNA MARIE RICHMOND,<br><br>    Defendant and Appellant. | 2d Crim. No. B258109<br>(Super. Ct. No. KA102775)<br>(Los Angeles County) |

A jury found Jenna Marie Richmond guilty of oral copulation of a person under 14 years of age (Pen. Code, § 288a, subd. (c)(1))[1] and lewd acts upon a child (§ 288, subd. (a)).  She was sentenced to five years in state prison.

We conditionally reverse.  The trial court treated the claim of psychotherapist-patient and medical records privilege as absolute.  The court failed to balance the defendant's right to cross-examine witnesses with the policies the privilege was intended to promote.

FACTS

The Leroy Haynes Center ("the Center') is a residential treatment facility for severely emotionally disabled children.  The Center is a level 12 facility.  A level 12 facility is one step below a locked psychiatric facility.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

In 2012, Richmond was in charge of a cottage at the Center. Her supervisor encouraged her to use the Center's van to do things with the children on days when they did not have school. Activities included going to the Glendora Recreation Center and the Donut Man.

Angel, born in September 1999, was placed in Richmond's cottage in June and July of 2013. Q. was Angel's roommate.

Q. testified that in July 2013, he and Angel decided to go to the Donut Man. Richmond drove them in the Center's van. When they arrived at the Donut Man, Q. left the van to go to the bathroom. When he returned to the van, he saw Richmond's head going up and down near Angel's penis. Q. thought she was giving him a "blow job." Q. waited outside the van until they were finished. He knew they were finished when Angel opened the van door. They all went into the donut shop, purchased donuts and returned to the Center. Q. did not report the incident because Angel asked him not to.

On a different occasion, Q. was using a computer in the staff office. The door to the bathroom was open and he could see inside. He saw Angel and Richmond in the bathroom. Richmond was bending over with her pants down. It looked like Angel had his penis in her vagina. After Angel left the bathroom, Q. told him "he smelled like pussy." Angel told Q. he had been having sex.

Q. did not report what he had seen for about three months. By that time Angel told him he could report the incidents. Angel was angry with Richmond because she blamed him for taking her keys. Q. admitted he was also in trouble with Richmond. Q. was 12 years old at the time he saw the incidents.

Angel testified that he did not remember ever going to the Donut Man with Richmond. Angel denied that he and Richmond ever had oral sex or intercourse; that he touched Richmond in a sexual manner or was touched by Richmond in a sexual manner; that he kissed Richmond, was involved in a relationship with Richmond, or ever wore Richmond's class ring.

Angel testified that while he was at the Center, he saw Kelly Price-Jarvis, a therapist, about once a week. He denied telling her that inappropriate sexual activity had

2

occurred. He denied telling her that he lied to the police about having a relationship with Richmond and would lie again.

Price-Jarvis testified she was a marriage and family therapist intern at the Center. Angel told her he had a sexual relationship with Richmond. Price-Jarvis notified the police. Angel told her he lied to everyone who asked him about the relationship and would continue to lie about it. Angel began wearing a female class ring. He would not tell Price-Jarvis where he got it.

William Harris is a unit manager at the Center. Harris became aware of allegations of a sexual relationship between Angel and Richmond. Harris began an investigation. As part of the protocol, Richmond was placed on leave. Harris was not able to interview Richmond because she resigned a day or two after being put on leave. Harris interviewed Angel. While speaking with Angel, Harris recovered a ring with the initials JMR inside. JMR coincides with Richmond's initials.

## DEFENSE

Los Angeles Sheriff's Detective David Johnson testified Harris never told him about the bathroom incident. Angel testified he never told Q. that he was in a relationship with Richmond. Richmond did not testify.

## DISCUSSION

Richmond contends errors by the trial court, defense counsel and the prosecution deprived her of due process.

Prior to trial Richmond made an ex parte application for an order to enforce a subpoena duces tecum served on the Center. The subpoena sought: "All records showing instances in which [Q.] has been disciplined by the Leroy Hanes Center. [¶] All records showing instances in which the Leroy Hanes Center documented behavioral problems by [Q.]. [¶] All investigative notes and reports relating to all interviews of [Q.] by the Leroy Hanes Center in relation to report(s) of inappropriate activity between Jenna Marie Richmond and Angel." It also sought records relating to Richmond's use of the Center's van. Richmond's ex parte application pointed out that the trial court may review any

privileged material in camera before deciding whether to release the information to the defense. The trial court did not compel the Center to produce records.

At trial Price-Jarvis refused to answer on cross-examination whether Angel had run away from the Center. She claimed the information is privileged. The court agreed that the information was relevant, but expressed doubt whether the information could be obtained from the witness. Defense counsel said he would ask a staff member.

Defense counsel then stated he wanted to inquire about Angel's and Q.'s psychological condition. The prosecutor objected that the inquiry into Angel's and Q.'s medical records is prohibited by the Health Insurance Portability and Accountability Act. (42 U.S.C. § 1320d et seq. "HIPPA.") The trial court agreed. The court stated the inquiry went beyond that permitted under Evidence Code section 1027.

Defense counsel asked Harris if Angel was in a therapeutic residential program. The prosecutor objected that it was an inquiry into Angel's private medical information. The trial court sustained the objection. When defense counsel asked Harris whether Angel exhibited extreme behaviors, Harris asserted HIPPA. The trial court restricted defense counsel to questions related to Angel's general reputation. The trial court also sustained objections to questions whether Angel or Q. ever ran away from the Center. Harris had objected that he could not speak about behaviors.

Pursuant to Richmond's motion for a new trial, she requested the trial court to issue a subpoena duces tecum for documents including Angel's and Q.'s therapy records. The court refused.

The trial court treated HIPPA as an absolute bar to the disclosure of medical information. But HIPPA allows the release of medical information without the patient's consent pursuant to a court order. (See *Snibbe v. Superior Court* (2014) 224 Cal.App.4th 184, 197-198.) Nor is the psychotherapist-patient privilege embodied in the California Evidence Code (§ 1014 et seq.) an absolute bar to the disclosure of information.

Instead, a criminal defendant's right to confront an adverse witness sometimes requires the witness to answer questions that call for privileged information. (*Davis v. Alaska* (1974) 415 U.S. 308, 320.)

4

In *People v. Reber* (1986) 177 Cal.App.3d 523, defendants sought psychotherapy records of the complaining witnesses by subpoenas duces tecum. The prosecution made a pretrial motion to quash the subpoenas on the ground of privilege. The trial court agreed with the prosecution. The Court of Appeal held the trial court erred to the extent it failed to (1) obain and examine in camera all the materials under subpoena; (2) weigh defendants' constitutionally based claim of need against the statutory privilege invoked by the People; (3) determine which privileged matters, if any, were essential to the vindication of defendants' rights of confrontation; and (4) create a record adequate to review its ruling. (*Id.* at p. 532.)

In *People v. Hammon* (1997) 15 Cal.4th 1117, our Supreme Court disapproved of *Reber*, but only to the extent the defendant seeks to discover privileged psychiatric information before trial. Prior to trial, the trial court may not have sufficient information to balance the defendant's need for cross-examination and the policies the privilege is intended to serve. (*Id.* at p. 1127.)

Here there is nothing in the record to suggest that in any of its rulings on a claim of privilege the trial court balanced Richmond's need for cross-examination with the policies the privilege is intended to serve. Nor is there anything in the record to show the trial court took the steps outlined in *Reber* for the treatment of privileged material. Instead, the trial court treated the claim of privilege as absolute.

We also note that defense counsel's pretrial motion to discover the contents of privileged material was premature. (*People v. Hammon*, *supra*, 15 Cal.4th at p. 1127.) Defense counsel failed to renew the motion during trial. He also failed to include Angel's and Q.'s therapy records in the subpoena. It was not until Richmond's motion for a new trial that substitute counsel attempted to obtain the therapy records. But given the trial court's treatment of privilege, renewing the motion or including therapy records in the subpoena would not have produced a more favorable result.

The remaining question is whether the trial court's errors require reversal. The error requires reversal only if the defendant can demonstrate prejudice. (*People v. Reber*, *supra*, 177 Cal.App.3d at p. 532.)

5

In *Reber*, the court found the error harmless because there was no direct restriction on cross-examination and the defendant admitted the charged sexual acts occurred. (*People v. Reber*, *supra*, 177 Cal.App.3d at p. 533.) Here the trial court did directly restrict cross-examination and Richmond did not admit to anything. In fact, the alleged victim denied anything inappropriate happened. The only witness who claimed he saw Richmond and Angel engage in sexual activity was 12 years old at the time. Of course, it is impossible to know what the excluded evidence might have shown. But there is at least some reasonable possibility that the excluded evidence contains information sufficiently helpful to Richmond to have resulted in a more favorable verdict.

The People argue that Richmond did not need Angel's records because he repeatedly denied having a relationship with her. But Angel's records may have been helpful to Richmond on cross-examination of Price-Jarvis or to rehabilitate Angel's testimony.

The People argue it is "unclear" if anything in Q.'s records would be relevant or if any relevant information would have value because it is cumulative. But it is unclear what the records show because the People objected to their production. The People cannot both object to the production of records and claim the failure to produce the records is harmless because the defendant cannot show what they contain.

Finally, the burden of the trial court's rulings on privilege fell entirely on the defense. The prosecution was able to elicit statements made by Angel to his therapist.

All things considered, the errors here are sufficient to undermine confidence in the outcome of the trial.

Under the circumstances here a conditional reversal is appropriate. We adopt the approach taken by the appellate court in *People v. Vanbuskirk* (1976) 61 Cal.App.3d 395. We also rely on section 1260.[2] This will ensure that Richmond receives a fair trial on the one hand and may possibly avoid an outright reversal on the other.

---

[2] Section 1260 states: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to,

In *Vanbuskirk*, the defendant was not allowed to challenge the fairness of the manner in which photographic identification of him was presented to witnesses prior to trial. As the court noted, this was a fundamental error that denied defendant a fair trial. (*People v. Vanbuskirk*, *supra*, 61 Cal.App.3d at p. 401.) So too here, Richmond did not receive a fair trial.

We remand for post-judgment proceedings. The trial court shall compel the Center to produce all the records Richmond sought from the Center. The trial court shall view these records in camera and determine whether they contain information relevant to the credibility of prosecution witnesses. Depending on its findings, the court may find in necessary to examine certain witnesses in camera.

The matter is conditionally reversed. The trial court shall make findings on its determination for possible review. If it determines the information contained in these records will have no appreciable effect on the outcome of these proceedings, it shall state it reasons for these findings and rearraign Richmond and pronounce judgment on the judgment.

On the other hand, if the trial court finds the information withheld denied Richmond a fair trial, it shall grant Richmond a new trial.

NOT TO BE PUBLISHED.

GILBERT, P.J.

We concur:

YEGAN, J.

PERREN, J.

---

or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

7

Juan Carlos Dominguez, Judge

Superior Court County of Los Angeles

_____

Innocence Legal Team, William P. Daley for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.