[Crim. No. 21633. Apr. 20, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE EDWARD HARRIS, Defendant and Appellant.

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Supreme Court, Donald L. A. Kerson and Nicholas G. Spirtos, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Carol Wendelin Pollack and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.—**

1. *Proceedings.*

This is an automatic appeal from a judgment imposing a penalty of death, prosecuted under the 1977 death penalty legislation (Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262, former Pen. Code, §§ 190-190.6). In an information filed October 16, 1979, defendant was charged with the murder of Hattie Marie Crumb and the murder of her husband, Robert L. Crumb.

Each murder charge was accompanied by three special circumstance allegations. Those charges alleged the murders were committed during the commission of a robbery in violation of Penal Code section 211 (former Pen. Code, § 190.2, subd. (c)(3)(i)); that the murders were committed during the commission of a burglary in violation of Penal Code section 459 (former Pen. Code, § 190.2, subd. (c)(3)(v)); and that defendant was personally present and, with the intent to cause the deaths, physically aided or committed such act or acts causing the deaths of two human beings (former Pen. Code, § 190.2, subd. (c)(5)). The information also alleged in count III that defendant had committed burglary of the Crumb residence. Count IV charged defendant with the robbery of Hattie Marie Crumb in violation of Penal Code section 211, and count V charged defendant with the robbery of Robert L. Crumb.

A jury found defendant guilty of all counts and found true the special circumstance allegations as to counts I and II. The jury determined that the penalty for defendant should be death. Defendant's motions for a new trial and to reverse the penalty verdict were denied. Defendant's appeal is automatic.

2. *Facts.*

The case against defendant was largely based on the testimony of Terry Avery, who was granted immunity from prosecution in exchange for her testimony. Avery's testimony was substantially corroborated by physical evidence and by expert witnesses.

Avery, who was 18 years old at the time, met defendant and Charles Moore in Denver, Colorado. In November 1977, the trio travelled in a stolen car from Denver to Kansas. In Lawrence, Kansas, they were involved in the abduction and the murder of Sam Norwood, the manager of a Woolworth store. Following that incident, the three took a bus from Kansas to Los Angeles for the purpose of robbing the apartment managers of a building in which Moore had lived in Long Beach.

Moore, Avery and defendant arrived in Los Angeles on November 30, 1977. Moore told defendant about the managers' jewelry collection and that the managers collected rents on the first of each month.

Moore took the others to the apartment building managed by the Crumbs at 921 East Broadway in Long Beach. They gained entry to the front gate of the building by waiting for a tenant, followed him as he unlocked the gate, and headed for the managers' apartment. Moore may have put on a stocking mask before he knocked on the door. When Mrs. Crumb cracked

open the door, Moore pushed it in. Mrs. Crumb recognized Moore and he pushed her back into the living room. Moore and defendant had guns drawn as they entered the apartment; Avery followed them inside. Defendant grabbed the victim's husband from the couch and hit him with the gun. Moore struck Mr. Crumb with the butt of his gun and asked Mrs. Crumb for the rent receipts. She responded that the receipts had been deposited. Both victims were struck again with the guns, and then were tied up with adhesive tape. Their hands were bound behind their backs, and they were gagged.

Avery was told to go into the bedroom to look for jewelry. She found and took jewelry from several containers and display cases. Defendant and Moore then entered and ransacked the bedroom looking for more jewelry.

Avery returned to the living room and defendant, who was kneeling over Mrs. Crumb, told Avery to go into the kitchen and find a knife. Avery found several knives in the kitchen, but lied to defendant, saying that she could not find any. Defendant went into the kitchen, found a butcher knife, returned to the living room and gave it to Moore. Defendant told Avery to pick up a pocketknife from a coffee table. She handed it to him. He opened the blade, returned it to Avery and told her to stab Mrs. Crumb. Avery superficially stabbed Mrs. Crumb while defendant twisted the gag around the victim's mouth. Defendant became angry with Avery, telling her that she had not done it right. Defendant took the pocketknife from Avery, and she returned to the bedroom. Looking back into the living room, Avery saw Moore stabbing Mr. Crumb with the butcher knife as defendant went over to hold down Mr. Crumb's legs. Moore stabbed Mr. Crumb for two or three minutes, then Moore started stabbing Mrs. Crumb in the back with the butcher knife. Moore then removed a diamond ring from her finger. Either defendant or Moore went through Mr. Crumb's wallet.

Both Robert and Hattie Crumb died of multiple stab wounds. All of the fatal wounds were inflicted with the butcher knife. Defendant did not stab either victim.

The trio returned to the Kona Motel, where they examined the jewelry. Avery received two rings and a bracelet, and defendant and Moore kept the rest. Defendant dismantled the guns, put the parts in a bag, and left the motel for 10 or 15 minutes saying he was going to throw the parts of the guns in the ocean. Avery, who was upset over the incident, returned by bus to Denver the following morning.

Several weeks later, Avery met with defendant and Moore in an apartment in Colorado. About two days later, she contacted the police and told them where to find Moore and defendant.

About one year later, police officers involved in the investigation of the murder of the manager of the Woolworth store in Lawrence, Kansas, drove defendant from Denver to Kansas. During that automobile ride, defendant, having been advised of his rights, admitted that he, Moore and Avery killed two people in Long Beach in 1977.

Defendant presented no witnesses at the guilt phase, and no substantial controversy surrounds the facts regarding the crimes leading to this trial. Defendant's primary contention concerns the system of selection of the jury venire.

*3. Use only of voter registration lists deprives defendant of his right to a jury drawn from a representative cross-section of the community.*

Prior to jury selection defendant moved to quash the jury venire on the ground that use of the voter registration list as the sole source for the jury pool in Los Angeles County deprived defendant of his right to a trial by an impartial jury drawn from a fair cross-section of the community, as guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 16 of the California Constitution. Defendant claims that the use of the voter registration list as the sole source for the pool of jurors leads to the systematic exclusion and significant underrepresentation of Blacks and Hispanics, because of the low percentage of those eligible who register coupled with the proportionally lower registration rate of minorities compared to the White population. Respondent urges this court to reject defendant's claim because his statistical showing was based on total population figures rather than more refined data showing the ethnic breakdown of those eligible to serve as jurors.

(a) *Burden of proof.*

■ The problem of narrowing readily available census figures to reflect a population defined to include only those presumptively eligible for jury service raises two fundamental questions presented by this case: Is use of total population figures sufficient to make a prima facie case of a violation of defendant's right to a jury drawn from a representative cross-section of the community? Which party has the burden of showing that a more narrowly defined population would or would not result in a disparity of constitutional consequence? We conclude that because of the difficulty in obtaining more accurate figures for jury eligibility, the defendant can present a prima facie case by showing through the use of total population figures a significant underrepresentation of a cognizable class. The burden then shifts to the state to demonstrate either that with more refined statistics, the underrepresentation would be reduced to a constitutionally insignificant dis-

parity, or that there exists a compelling justification for the procedure which results in the underrepresentation.

(b) *Evidence at defendant's motion to quash the jury venire.*

At the motion to quash the jury venire, the parties stipulated that the trial court could read and consider the testimony in a similar case of Raymond Arce, the Director of Juror Services Division of the Los Angeles County Superior Court. That testimony described the procedure employed at the time of this trial to select potential jurors. The jury commissioner drew names randomly from the list of the registrar of voters and mailed questionnaires to the people selected. Completed questionnaires were used to exclude individuals as prospective jurors and to compile the master jury pool. No follow-up procedure was used to pursue those who did not return the questionnaire.

In Mr. Arce's view, the main problem with use of sources in addition to voter registration would be the avoidance of duplication of potential jurors when the lists have few common characteristics except for name and address. At the time of this trial, however, 29 of the 46 California counties were using multiple sources for identifying potential jurors. Since July 1, 1981, the use of multiple source lists has been required by Code of Civil Procedure section 204.7.[1]

In support of his motion to quash the jury venire, defendant offered evidence compiled by Professor Edgar Butler, chairman of the sociology department at the University of California at Riverside. Dr. Butler holds degrees in sociology and demography and has conducted studies of jury panels in all of the judicial districts in Los Angeles County. His qualifications are not challenged, and his work has been the basis for similar motions in other cases.

Dr. Butler conducted a survey of Long Beach Superior Court jury panels from May 5 through August 15, 1979. The survey compared the composition of jury venires appearing at the Long Beach courthouse to the composition of the entire County of Los Angeles. The survey involved only those potential jurors appearing at the Long Beach courthouse, not the original

---

[1]Code of Civil Procedure section 204.7, subdivision (a) provides: "Source lists of jurors shall identify persons who reside in the county, and who are 18 years of age or older, shall include those who are registered voters, and to the extent that systems for producing jury lists can be practically modified, without significant cost, shall also include those who have been licensed or issued an identification card pursuant to Article 3 (commencing with Section 12800) and Article 5 (commencing with Section 13000) of Chapter 1 of Division 6 of the Vehicle Code. Qualified jury lists and master jury lists derived from the source lists shall be prepared so as to reasonably minimize duplication of names."

contact pool. The survey was conducted through the use of questionnaires distributed by the jury clerk. Nine hundred fifty-nine potential jurors, 98 percent of all those appearing at the courthouse, completed the voluntary questionnaire. The forms asked questions regarding sex, age, education, income and ethnicity. The study revealed that for the period during which the survey was conducted, 5.5 percent of the Long Beach potential jurors were Black and 3.4 percent were Hispanic.

Dr. Butler's estimates of Los Angeles County populations were based on the 1970 census supplemented with later studies of population changes. The 1970 census indicated that 18.3 percent of Los Angeles County was Hispanic and 10.8 percent Black. Dr. Butler estimated that in 1975, Los Angeles was 21.3 percent Hispanic and 11.6 percent Black. He projected that in 1980, 33 percent of Los Angeles County would be Hispanic and 15 to 17 percent would be Black. Dr. Butler's estimate did not exclude illegal aliens, persons under 18 years of age, or others who would be statutorily ineligible to serve as jurors.

Comparing these county-wide figures to the results of the jury venire surveys, Dr. Butler testified that the comparative disparity[2] for Blacks was 49 percent using 1970 figures, 53 percent for 1975, and 67 percent for 1980. For Hispanics the comparative disparities were 81 percent for 1970, 84 percent for 1975, and 90 percent for 1980.

Defendant has also presented other figures based on the 1980 census,[3] which, of course, became available after defendant's trial. Those figures

---

[2]Social scientists employ different techniques for measuring disparities involving jury representativeness. Several of these methods are described in detail in Kairys, et al., *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776 (hereafter cited as Kairys).

Briefly, the simplest method is the absolute disparity standard. It measures the difference between the proportion of the studied group in the overall population of presumptively eligible jurors and the proportion of the group appearing in the pool of jurors used by the state.

The second, and according to the authors, preferred method, is the comparative disparity standard. This standard measures how the use of voter lists alters the probability that a member of a particular cognizable group will be summoned to serve on a jury.

Some courts have applied the statistical significance test to measure representativeness. (See *Castaneda* v. *Partida* (1977) 430 U.S. 482, 496-497, fn. 17 [51 L.Ed.2d 498, 511-512, 97 S.Ct. 1272]; *People* v. *Buford* (1982) 132 Cal.App.3d 288, 297 [182 Cal.Rptr. 904]; see also Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases* (1966) 80 Harv.L.Rev. 338, 353-356; Kairys, *supra*, 65 Cal.L.Rev. at p. 792.) This test describes the probability that the absolute disparity would appear by chance in a random draw from the population.

We do not at this time adopt one method of measurement to the exclusion of the others. Rather, it will be helpful when possible in any particular case to compare the results under the various techniques in deciding whether a particular disparity suggests a constitutional violation.

[3]We take judicial notice of the federal census. (Evid. Code, § 452, subds. (b), (c) and (h); *People* v. *Williams* (1883) 64 Cal. 87, 91 [27 P. 939].)

show that the 1980 Black population in Los Angeles County was 12.6 percent, and the Hispanic population was 27.6 percent. The comparative disparity for 1980 using these figures is 56.3 percent for Blacks and 87.7 percent for Hispanics.

We recognize that Long Beach juries are not selected evenly from all parts of Los Angeles County. Code of Civil Procedure section 203 provides that "in the County of Los Angeles no juror shall be required to serve at a distance greater than 20 miles from his or her residence." It is likely that most of the jurors interviewed by Dr. Butler at the Long Beach courthouse came from within a 20-mile radius of the courthouse, a fact which may account to some degree for the discrepancy in racial representation between the persons interviewed and the county population.

The parties, however, presented evidence and argued this case on the assumption that all juries in Los Angeles County must be representative of the entire county. The principal question before us is whether evidence based on total countywide population figures, rather than jury-eligible population, is adequate to make out a prima facie case; for the reasons explained in this opinion, we conclude that it is. The state has not attempted to rebut this prima facie showing by arguing that the Long Beach juries need only represent those persons living within 20 miles of the courthouse, and has not attempted to show that such juries were truly representative of that limited area.

(c) *The trial court's ruling on the motion to quash the jury venire.*

The trial court concluded that "the use of a single-source method of creating a prospective jury panel has caused a problem because of the failure of certain members of the citizenry to register to vote. This then, according to the evidence presented, may tend to create a bias in terms of age or ethnicity." However, the trial court denied the motion to quash the jury venire on the ground that no showing of denial of a fair cross-section had been made because defendant's comparisons relied on the general population, and it was defendant's burden to show how many Hispanics and Blacks were "eligible to vote."

4. *The fair cross-section principle.*

It is a fundamental tenet that a criminal defendant is entitled to trial by an impartial jury drawn from a representative cross-section of the community. This right is guaranteed by the Sixth Amendment to the federal Constitution (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]) as well as by article I, section 16 of the California

Constitution (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748]).

In *Wheeler,* which involved the use of peremptory challenges by the prosecutor to exclude Black jurors, we held that the exclusion of prospective jurors solely on the ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community. (*Id.,* at pp. 276-277.) Detailing a series of decisions by the United States Supreme Court holding that an impartial jury must be drawn from a representative cross-section of the community, Justice Mosk noted "[t]he rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*People* v. *Wheeler, supra,* at pp. 266-267, fns. omitted.)

"This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible." (*Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1185, 66 S.Ct. 984, 166 A.L.R. 1412].) But it does mean that "a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits." (*People* v. *Wheeler, supra,* at p. 277.)

If the system does produce representative juries, one would expect that over a period of time, the composition of the average jury pool would be roughly reflective of the makeup of the eligible community. By focusing on particular cognizable groups in the community, and comparing the percentage of those groups appearing in jury pools to the percentage of the group in the general population, courts obtain some measure of whether the system is successfully accomplishing its goal of selecting juries representative of a fair cross-section of the community.

*Wheeler* recognized that the ideal of a representative jury comprised of a fair cross-section of the community may be systematically compromised at the various stages of the selection process. *Wheeler* dealt with the stage of

the proceedings where the parties exercise their statutory "peremptory" and "for cause" challenges to individual jurors sitting on the venire.[4]

*Wheeler* also discussed the stage of the proceedings raising the issue in the instant case: the procedure of compiling the master list from which venires are drawn. "Obviously if that list is not representative of a cross-section of the community, the process is constitutionally defective *ab initio*." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 272.)

This case involves jury selection at the initial stage of the process, but not a claim of intentional exclusion of Blacks or Hispanics. The parties agree that this case does not involve a claim that the voter registration lists are unfairly compiled or that the jury commissioner purposefully discriminates in the selection of panels from the initial pool. Neither does defendant claim that the jurors who appeared at the Long Beach courthouse were not representative of the master list composed from the voter registration list.

5. *Elements of a prima facie violation of the fair-cross-section requirement.*

The question disputed by the parties is whether defendant met his burden of making a prima facie showing of constitutional invalidity of jury pools based on random selection from a list derived solely from a voter registration list. ■ "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].) ■ Defendant asserts that the evidence presented at the motion to quash the venire met this standard and, having done so, the burden should have shifted to the state to come forward with either a more precise statistical showing that no constitutionally significant disparity existed or that there was a compelling justification for the procedure which results in the disparity in the jury pool.

(a) *A "distinctive" group.*

The first prong of the *Duren* test was met in this case, as the Attorney General concedes. Two showings have been suggested before an asserted

---

[4]Though not at issue in that case, *Wheeler* also cautioned courts to be alert to prevent abuse of discretionary hardship exemptions which could tend to skew the representative cross-section goal. (See also *People* v. *Buford, supra,* 132 Cal.App.3d 288.)

group will be deemed to be a "distinctive" or "cognizable" group in the community. The members of the group "must share a common perspective arising from their life experience in the group, i.e. a perspective gained precisely *because* they are members of that group." (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 98 [154 Cal.Rptr. 734, 593 P.2d 595] (lead opn.).) In addition, the party asserting the claim may have to show that "no other members of the community are capable of adequately representing the perspective of the group assertedly excluded. This is so because the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community *attitudes,* not of groups per se." (*Ibid.*)[5]

■ Both Blacks and Hispanics share with other members of their groups a common perspective arising from their respective experiences as a group, and no other members of the community are capable of adequately representing their perspectives. Thus, Blacks and Hispanics are cognizable groups for purposes of fair cross-section analysis. (See, e.g., *Castaneda* v. *Partida, supra,* 430 U.S. 482, 495 [51 L.Ed.2d 498, 511]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 20, fn. 45 [168 Cal.Rptr. 128, 616 P.2d 1301].)

(b) *Fair representation of the group in relation to the number of such persons in the community.*

■ It is the second requirement of *Duren* that the Attorney General claims defendant has not adequately demonstrated: that the representation of the studied group in the jury pool is not fair and reasonable in relation to the number of such persons in the community. The Attorney General claims that the primary flaw in defendant's statistical evidence is that it improperly compares the percentage of each cognizable group in the jury pool to the group's proportion of the *total* population rather than to its proportion among the group eligible to vote. The Attorney General implores this court to reject summarily any attempt to demonstrate disparate representation on the jury venire "unless it is based on a comparison of ethnic breakdown among those registered to vote against the ethnic breakdown of the venire."

---

[5]The validity of the second part of the *Rubio* test is questionable, since the constitutional rule requiring a representative jury bars not only the exclusion of a group, but disproportionate reduction in its members; if some persons with a particular life experience are barred from the jury, others cannot properly represent the perspective of those excluded because the number of persons with that perspective will be disproportionately small. (See dis. opn. of Tobriner, J. in *Rubio* v. *Superior Court, supra,* 24 Cal.3d at p. 109 and cases there cited.)

Respondent misconstrues the thrust of defendant's argument. Defendant does not claim that the jury venires do not comprise a fair cross-section of the voter registration list. Defendant claims, and has produced statistical evidence showing, that there is a large and increasing proportion of the general population that fails to register to vote, and that the proportion of minorities failing to register is larger than that for the general population. The national figures show that in 1972, 27.7 percent of those eligible to vote did not register. In 1976, the percentage of unregistereds increased to 33.3 percent and in 1978 to 37.4 percent. For minority groups, the percentage of eligible persons registering to vote is significantly below that of the general population.[6] Thus, use of voter registration lists as the sole source of selection results in underrepresentation of minorities on jury venires as well as underinclusion of the general population, many of whom, though otherwise eligible to serve as jurors, fail to register to vote. Despite the known risk of drawing unrepresentative juries, many counties have used voter registration lists as the source for venires because the qualifications of eligibility to vote are roughly equivalent to those for jury service.[7] Thus, use of a voter registration list provides a population that is "pre-screened" for jury eligibility.

Respondent's specific objections to Dr. Butler's methods and the accuracy of his figures do not undermine the conclusion that a gross disparity exists. Respondent contends that the 1970 census figures were inaccurate, the 1975 figures were based on the 1970 figures, the assumptions regarding under-

---

[6] The figures for the national percentage of Blacks not registered to vote are 34.5 percent in 1972, 41.5 percent in 1976 and 42.9 percent in 1978. The national figures for those of Spanish origin are 55.6 percent in 1972, 62.2 percent in 1976, and 67.1 percent unregistered in 1978.

[7] Compare the general provisions relating to qualifications to vote with those prescribing eligibility to serve as a juror.

California Constitution, article II, section 2, provides: "A United States citizen 18 years of age and resident in this state may vote." California Constitution, article II, section 3, provides: "The Legislature shall define residence and provide for registration and free elections." California Constitution, article II, section 4, provides: "The Legislature shall prohibit improper practices that affect elections and shall provide for the disqualification of electors while mentally incompetent or imprisoned or on parole for the conviction of a felony."

Code of Civil Procedure section 198 sets forth the general rules of competency to serve as a juror: "A person is competent to act as juror if he or she is [¶] 1. A citizen of the United States of the age of 18 years who meets the residency requirements of electors of this state; [¶] 2. In possession of his or her natural faculties and of ordinary intelligence . . .; and [¶] 3. Possessed of sufficient knowledge of the English language . . . ." Code of Civil Procedure section 199 disqualifies persons who have been convicted of malfeasance in office or any felony or other high crime, or any person serving as a grand juror. Sections 200 and 201a provide that persons shall be excused from jury service if it would entail undue hardship on the person or the public served by the person. Section 203 provides that in Los Angeles County, no person shall be required to serve at a distance greater than 20 miles from his or her residence.

representation were based on inaccurate figures, the study compared the entire population rather than those eligible for jury service, and the study was conducted for too short a period of time to draw any positive conclusions. In addition to these criticisms, the Attorney General finds fault with examining those who appeared at the courthouse rather than the "original contact pool."

As to the "inaccuracy" of the 1970 census, the evidence indicates that the census figures were inaccurate because they tend to *undercount* cultural minorities. Thus, any inaccuracy in the figures used for comparison for 1970 would tend to result in a lesser showing of a cross-sectional disparity than actually exists.

It may be true that the three-month period of the study is not as long as would be ideal to assure a greater degree of reliability in the conclusions. However, the period is of sufficient length to suggest a pattern of gross disparity, and no suggestion has been made that if the study were conducted over a longer period of time, different results would appear.

We also reject respondent's objection that defendant's expert only surveyed those appearing at the courthouse, and not the original contact pool, some of whom failed to appear or were excused for various reasons. The panel which tried defendant was drawn from those jurors who appeared. The representative character of those jurors, not of the "original contact pool," is the proper basis for comparison with the county population figures.

Criticism has been appropriately leveled at the use of total population figures as the comparison base for showing underrepresentation. (*People* v. *Lewis* (1977) 74 Cal.App.3d 633, 646 [141 Cal.Rptr. 614]; *People* v. *Mooring* (1982) 129 Cal.App.3d 453 [181 Cal.Rptr. 71]; *People* v. *Spears* (1975) 48 Cal.App.3d 397, 404 [122 Cal.Rptr. 93]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 128-129 [115 Cal.Rptr. 109], cert. den. 420 U.S. 994 [43 L.Ed.2d 677, 95 S.Ct. 1435].) However, such criticism of the statistical short-comings of the use of total population figures fails to acknowledge the difficulty in obtaining more refined comparison groups. As Professor Kairys has observed, "eligible population figures are almost impossible to obtain." (Kairys, *supra,* 65 Cal.L.Rev. at pp. 785-786, fn. 63.) The difficulty of the Federal Bureau of the Census in attempting to determine the citizenship status of Hispanics is illustrative: "A reliable estimate of the number of undocumented aliens residing in the United States is not available and is unlikely for the immediate future." (Rep. to Cong. by Comptroller General,

Number of Undocumented Aliens Residing in the United States Unknown, GGD-81-56 (Apr. 6, 1981) pp. 3-4.)[8]

In view of the difficulty in arriving at reliable figures for the jury eligible population for any particular cognizable class, total population figures have been accepted where the disparity resulting from the use of those figures is "somewhat greater" than if the narrower jury eligible group were used. "[I]t may be so difficult to obtain full and accurate figures for 'jury eligibles' that to require such figures would—at least in some cases—place an insuperable burden on defendant . . . . [W]e will be content with a somewhat greater disparity when general population figures are used, simply because they do not clearly reflect the proper measure for a fair cross section: the number of persons actually eligible for jury service under valid statutory qualifications." (*United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, 570, fn. 13.)

Comparing the makeup of the actual jury pool with that of the entire population of persons presumptively eligible for jury service would be preferable to comparing with total population because *if* the cognizable class has a lower percentage of jury eligibles than the general population, a showing that that class' representation in the jury pool is less than the group's percentage of the general population does not necessarily show that the group is underrepresented. "Nevertheless, because it may be difficult to obtain full and accurate figures for jury eligibles and to require such data may place an insuperable burden on a litigant, this preference must accede to tolerance." (*Foster* v. *Sparks* (5th Cir. 1975) 506 F.2d 805, 833, Appen., An Analysis of Jury Selection Decisions by Hon. Walter P. Gewin, U.S. Circuit Judge.)

The question raised by the difficulty of producing statistics concerning the precise proportion of jury eligibles is who should bear the burden of proof on whether a disparity exists. In our view, although more refined statistics would be preferable if available, when they are not, it is sufficient for the defendant to show a significant disparity based on the use of total population figures. The burden then shifts to the state to either show that when the

---

[8]Defendant has asked this court to take judicial notice of the cited document, along with several other studies that reach similar conclusions. The Attorney General opposes this second request for judicial notice on the ground that the documents relate to evidentiary matters that should have been presented to the trial court. We conclude that this court should take judicial notice of the requested documents. Those documents do not involve factual questions peculiar to this case. The cited report falls within the definition of official acts of the executive department of the United States. (Evid. Code, § 452, subd. (c); see also *White* v. *State of California* (1971) 21 Cal.App.3d 738, 743 [99 Cal.Rptr. 58] (publication of the United States Army Corps of Engineers relating to navigability of a portion of the Petaluma River).)

group total population is reduced to jury eligibles, no underrepresentation exists, or to justify the underrepresentation by showing "that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 367-368 [58 L.Ed.2d 579 at p. 589].)

We believe that this approach is supported by decisions of the United States Supreme Court holding that a prima facie case of underrepresentation is made on the basis of a disparity between the cognizable group's representation on jury panels and the percentage of those groups in the community as shown by total population census figures.

The jury challenge in *Duren* v. *Missouri, supra,* 439 U.S. 357, involved a Missouri law that granted women who so requested an automatic exemption from jury service. The high court held that petitioner had satisfied the second prong of the prima facie test by use of statistics showing that women comprised 54 percent of the adult community, but only 15 percent of the jury venires from which juries were chosen. It rejected the speculation of the Missouri Supreme Court that changing population patterns and unequal voter registration between men and women rendered the census figures an unreliable frame of reference. (*Id.,* at p. 365 [58 L.Ed.2d at p. 587].) The court responded to those criticisms by declaring that "the fair-cross-section requirement involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the *community,* not of voter registration lists." (*Duren, supra,* at p. 365, fn. 23; italics in original.)

Although a final conclusion as to whether the fair-cross-section requirement has been met should ideally be based on comparison to the jury eligible community, we believe that the quoted language of the high court supports the conclusion that the *initial* burden may be met by showing significant underrepresentation of the cognizable group based on figures showing its total population in the community as a whole.

*Castaneda* v. *Partida, supra,* 430 U.S. 482 also supports the proposition that total population figures are sufficient to make a prima facie case of underrepresentation. *Castaneda* involved an equal protection challenge to the makeup of grand juries in Hildago County, Texas. The defendant in that case introduced statistical evidence based on the 1970 census showing that 79.1 percent of the population was Mexican-American, on the assumption that all persons of Spanish language or Spanish surname were Mexican-Americans. During an 11-year period, the average percentage of Spanish-surnamed grand jurors was 39 percent. The Texas Court of Criminal Ap-

peals held that defendant failed to make out a prima facie case of discrimination in grand jury selection on the ground that there was no showing by defendant regarding "how many of the females who served on the grand juries were Mexican-Americans married to men with Anglo-American surnames, how many Mexican-Americans were excused for reasons of age or health, or other legal reasons, and how many of those listed by the census would not have met the statutory qualifications of citizenship, literacy, sound mind, moral character, and lack of criminal record or accusation." (*Castaneda, supra,* 430 U.S. at pp. 489-490 [51 L.Ed.2d at p. 507].) The United States Supreme Court disagreed, holding that the showing made by the defendant "shifted the burden of proof to the State to dispel the inference of intentional discrimination." (*Id.,* at pp. 497-498 [51 L.Ed.2d at p. 512].)

Presumably, the inference of intentional discrimination might have been dispelled by a showing by the state that no disparity would have resulted if the comparison had been made to the jury eligible population. Making its own calculation of the proportion of illegal aliens based on breakdowns of native and foreign parentage and birth, the court concluded that the percentage of Mexican-Americans was somewhat less than the figure produced by the defendant. The court continued to refer to the total population figures, however, "particularly since the State has not shown why those figures are unreliable." (430 U.S. at p. 487, fn. 6 [51 L.Ed.2d at p. 506].) Similarly, in this case, there has been no showing beyond speculative assertions that the gross disparity evidenced by use of total population figures would be diminished were a comparison made with the jury eligible minority populations.

The respondent also describes defendant's use of the comparative disparity method of showing underrepresentation as a "resort to statistical contrivance," and asserts that courts have universally relied upon absolute disparity in deciding underrepresentation cases. But, even using the absolute disparity method, based on the 1980 census figures showing that Blacks comprise 12.6 percent and Hispanics 27.6 percent of the population of Los Angeles County, underrepresentation of 7.1 percent for Blacks and 24.2 percent for Hispanics results.

Contrary to respondent's assertions, courts have recognized the inadequacy of measuring underrepresentation based merely on absolute disparity. (See, e.g., *Bradley* v. *Judges of Super. Ct. for Los Angeles Cty.* (9th Cir. 1976) 531 F.2d 413, 416, fn. 8.) Experts who have studied the question conclude that the comparative disparity method is preferable. The theory of the comparative disparity method is simply stated. "[I]n a fair, cross-sectional system, the probability of any eligible person being included in the source (or in the final pool) would be the same for every eligible person,

regardless of race, ethnic background, sex, age, or socio-economic status. The comparative disparity standard measures representativeness by the percentage by which the probability of serving is reduced for people in a particular category or cognizable class." (Kairys, *supra,* 65 Cal.L.Rev. at p. 790.) The primary advantage of the comparative disparity method is that its results are not affected by the proportion of the population in the specified category.[9] Thus, for example, in this case using the 12.6 percent figure for Blacks, under respondent's theory, all Blacks could be excluded from jury venires without producing an absolute disparity violative of the fair-cross-section principle. Clearly, the Constitution could not tolerate such a result.

Respondent asserts that random selection from a voter registration list as the sole source of potential jurors has been found constitutionally valid, citing *People* v. *Sirhan* (1972) 7 Cal.3d 710, 749-750 [102 Cal.Rptr. 385, 497 P.2d 1121], certiorari denied 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382], and that to find selection of jury panels from voter registration lists violative of the fair-cross-section requirement necessitates overruling *Sirhan.* In *Sirhan,* however, this court held that "[t]he use of voter registration lists as the sole source of jurors is not constitutionally invalid [citations], at least in the absence of a showing that the use of those lists resulted 'in the systematic exclusion of a "cognizable group or class of qualified citizens"' [citations], or that there was 'discrimination in the compiling of such voter registration lists.' [Citations.]" (*Id.,* at pp. 749-750.) However, it is exactly the requirement of *Sirhan* regarding exclusion of a cognizable group that defendant has attempted to show.

[redacted] Since *Sirhan,* the United States Supreme Court has made it clear that unlike equal protection analysis, when the defendant alleges violation of the Sixth Amendment fair-cross-section principle, no showing of intent to discriminate is required. "[E]qual protection challenges to jury selection and composition are not entirely analogous to the case at hand. In the cited cases, the significant discrepancy shown by the statistics not only indicated discriminatory effect but also was one form of evidence of another essential element of the constitutional violation—discriminatory purpose. Such evidence is subject to rebuttal evidence either that discriminatory purpose was not involved or such purpose did not have a determinative effect. [Citations.] In contrast, in Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (*Duren* v. *Missouri, supra,* 439 U.S. 357, 368, fn. 26 [58 L.Ed.2d 579, 589].)

[9]However, too small a sample size negatively affects the accuracy of the prediction. (See Kairys, *supra,* 65 Cal.L.Rev. at p. 795, fn. 103.)

 We conclude that defendant has made a showing sufficient to satisfy the second prong of *Duren,* "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." (*Duren, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at p. 587].)

(c) *Systematic exclusion of the group.*

 Finally, to make a prima facie showing of a violation of the fair-cross-section requirement, defendant must show that the underrepresentation is due to "systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364.) Respondent asserts that nothing in the process of random selection from voter registration lists systematically excludes Blacks or Hispanics. Respondent refers to this court's statement in *People* v. *Sirhan, supra,* 7 Cal.3d at p. 750, footnote 26, that those who choose not to register to vote are not a cognizable class, and respondent concludes that defendant "has not shown that it underrepresents any of those who choose to register to vote." Defendant does not claim that the jury pool underrepresents those on the voter registration list, or that those who choose not to vote are a cognizable class. Rather, defendant complains that the *system* of solely using voter registration lists results in underrepresentation of Blacks and Hispanics compared to their proportions in the community.

Systematic underrepresentation means that the disparity is "inherent in the particular jury-selection process utilized." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 366 [58 L.Ed.2d at p. 588].) In this case, defendant has made a showing adequate to demonstrate, in the absence of rebuttal evidence by the state, that the underrepresentation results from the process utilized to choose jury venires—random selection solely from voter registration lists.

As we have explained, to make a showing of violation of the fair-cross-section requirement, the defendant need not show that the jury commissioner intended to discriminate against Blacks or Hispanics. All that need be shown is that the system of selection results in denial of a jury pool representing a fair cross-section of the community. As the court said in *People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 971-972 [113 Cal.Rptr. 732]: "The decisions requiring the accused to show systematic, purposeful discrimination do not square with others which condemn discrimination stemming from negligence or inertia. The latter recognize that official compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it. In formulating a panel for a grand jury endowed with the criminal indictment function, officials must adhere to a standard more stringent than mere abstention from intentional discrimina-

tion; they have an affirmative duty to develop and pursue procedures aimed at achieving a fair cross-section of the community." (Fn. omitted.)

We hold that defendant has adequately met the third prong of the *Duren* test, showing systematic exclusion of Blacks and Hispanics in the jury selection process.

■ In sum, we hold that defendant's use of statistical evidence using total population figures was sufficient to make a prima facie showing of a gross disparity resulting in a violation of defendant's right to an impartial jury drawn from a fair cross-section of the community. The burden then shifts to the state to rebut the prima facie case. The state may be able to do so by showing, through use of figures defining those presumptively eligible for jury service, that no disparity of constitutional significance exists, or that even with the use of multiple sources and all other practical means, a certain level of disparity is unavoidable. Finally, it may be able to justify the underrepresentation by showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion." (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 367-368 [58 L.Ed.2d at p. 589].) In the present case, however, the state has not attempted to rebut the defendant's proof but has shortsightedly rested its entire argument on the mistaken claim that defendant failed to present a prima facie case.

■ The error in concluding that defendant had failed to make a prima facie showing of a violation of his right to a jury drawn from a representative cross-section of the community is prejudicial per se. " ' "The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' " (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 283, quoting *People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862].)

The foregoing reasoning leads us to conclude that defendant's conviction must be reversed. A majority of the justices of this court, however, do not agree on whether, and to what extent, the rule announced in this case should be given retroactive effect. We therefore take no position as to the disposition of other cases presenting issues concerning the representative character of juries selected from voter registration lists alone.[10]

---

[10]For trials occurring after July 1, 1981, the problem may have been obviated by the statutory encouragement to institute multiple-source lists for selection of jury pools. (Code Civ. Proc., § 204.7.)

### 6. *Issues relating to the special circumstances allegations.*

Defendant raises several arguments attacking the use of multiple special circumstances in this case. Primarily, defendant contends that California statutory law and the federal Constitution prohibit the use of multiple special circumstances based on a unified course of conduct undertaken to further one principal criminal objective. Defendant urges that the functions and objectives of the special circumstances are not served by dividing a unified course of conduct into multiple special circumstances. In addition, their use in this case violates the statutory prohibition of double punishment embodied in Penal Code section 654. Finally, the charging of burglary (former Pen. Code, § 190.2, subd. (c)(3)(v)) and robbery (former Pen. Code, § 190.2, subd. (c)(3)(i)) special circumstances is improper in this case.

Defendant's theory is that the special circumstances concept cured the constitutional infirmities of the California death penalty law by narrowing the class of murderers subject to capital punishment and by helping to guide sentencing discretion, but that multiple charging of special circumstances does not serve either of these objectives, and in fact undermines the attempt to limit and direct the jury's sentencing discretion. Since only one special circumstance is necessary to identify capital defendants and trigger the penalty phase, the additional special circumstances serve only to skew the decision-making process and unfairly prejudice the defendant before the penalty jury.

■ Defendant's argument is unpersuasive. First, we note that the death penalty statute itself expressly contemplates charging more than one special circumstance. Former section 190.2 establishes the mandatory penalty "for a defendant found guilty of murder in the first degree . . . in any case in which *one or more* of the following special circumstances has been charged and specially found . . ." (italics added). Additionally, other sections of the death penalty law implicitly recognize the possibility of multiple special circumstances, with numerous references to "special circumstances," and "*each* . . . special circumstance."

Defendant contends that this language "may simply be recognition that two murders, each with its own special, can be joined . . . ." If the Legislature had intended to limit special circumstances to one per murder count, it would have been a simple matter to so state. The plain words of the statute make clear that multiple special circumstances may be charged where there is supporting evidence.

Defendant argues that even if the statute is construed to allow multiple charging, such a practice is violative of federal constitutional principles,

because he is unfairly prejudiced by the explicit requirement of former section 190.3, subdivision (a) that when determining sentence the trier of fact consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." According to defendant, the jury is already aware of the underlying circumstances of the crime, so that a direction that the same facts be considered as special aggravating circumstances serves only to stack the cards against him.

Defendant does not dispute the obvious propriety of the penalty jury considering the circumstances of the murder (i.e., that it occurred in the course of a burglary, robbery, kidnaping, etc.; that it involved torture; that the victim was poisoned, and so on), but only takes exception to the designation of certain circumstances as "special circumstances." Former section 190.3 simply lists factors to be taken into account by the jury in determining the penalty. Since a finding of special circumstances is what triggers the penalty phase to begin with, it seems clear that these circumstances are relevant to the penalty decision.

In a related argument, defendant contends that designating multiple special circumstances to be considered by the penalty jury "legislatively weights the sentencing factors," thus violating the Eighth Amendment requirement that a death sentence be decided only by the trier of fact.

This argument is inconsistent with recent United States Supreme Court decisions and decisions of this court upholding death penalty statutes. Former section 190.3 simply lists mitigating and aggravating factors to be taken into account by the penalty jury if relevant to a particular case. One of the factors listed is any special circumstance found true pursuant to former section 190.1. This court discussed the listing of mitigating and aggravating circumstances as " 'aspects of the Georgia scheme which a majority of the [United States Supreme Court] considered essential to its constitutionality.' " (*People* v. *Frierson* (1979) 25 Cal.3d 142, 176 [158 Cal.Rptr. 281, 599 P.2d 587] (plurality opn. of Richardson, J.); quoting *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 432 [134 Cal.Rptr. 650, 556 P.2d 1101].)

In comparing the Florida statute upheld by the United States Supreme Court in *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960], the lead opinion of this court recognized the appropriateness of including special circumstances in the section 190.3 list of factors: "We find worthy of note that the aggravating and mitigating factors enumerated in the Florida statute are almost identical to the special circumstances, and the aggravating and mitigating factors, described in the California act. . . .

Thus, although the California law would permit the trier of fact to consider evidence as to 'any matter' relevant to mitigation or aggravation (§ 190.3), the trier of fact is not left wholly unchecked and unguided in its determination for, as in Florida, the California statute lists specific factors which must be considered in deciding whether or not to impose the death penalty." (*Frierson, supra,* at p. 177.) It is therefore our view that multiple special circumstances may be charged in appropriate cases. ■■■ Nevertheless, we conclude that the federal Constitution and California statutory laws prohibit the cumulative use of special circumstance allegations in this case.

■■■ The 1977 death penalty statute represents the California Legislature's attempt to comply with the high court's mandate in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] and *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] that the discretion of the jury to impose a sentence of death "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (*Gregg, supra,* 428 U.S. at p. 189 [49 L.Ed.2d at p. 883] [opn. of Stewart, J., Powell, J. and Stevens, J.].) "[T]hat guidance must be provided by objective sentencing standards designed to compel the jury to 'focus on the particularized circumstances of the crime and the defendant.' (Fn. omitted; *id.,* at p. 199 [49 L.Ed.2d at p. 889].)" (*People* v. *Green* (1980) 27 Cal.3d 1, 48 [164 Cal.Rptr. 1, 609 P.2d 468].) In California, that guidance is provided by limiting the potential imposition of a death sentence to those first degree murders involving one or more "special circumstance."

In those cases where the "defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true" (former Pen. Code, § 190.3), the trial proceeds to the penalty phase for the jury to determine whether the sentence shall be death or life imprisonment without possibility of parole. In determining the appropriate sentence, the jury is directed to take into account "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . ." (former Pen. Code, § 190.3, subd. (a)). Thus, particular special circumstances found to be true in the guilt phase become aggravating factors in the penalty phase. Because the jury is directed to take into account the existence of any special circumstances found to be true, the constitutionally mandated objective of focusing on the particularized circumstances of the crime and the defendant is undercut when the defendant's conduct is artificially inflated by the multiple charging of overlapping special circumstances or multiple special circumstances based on an indivisible course of conduct having one principal criminal purpose.

The special circumstances of burglary with intent to commit larceny and robbery involve conduct with the same underlying intent: to steal the property of the victim. (*People* v. *Green, supra,* 27 Cal.3d at p. 54.) ▮ The evidence in this case supports the conclusion that defendant and his companions travelled to Long Beach for the purpose of robbing the victims. In the course of that robbery, the defendant committed a burglary and two murders to facilitate the robbery. Under these facts, the robbery and burglary special circumstances are necessarily overlapping because they both describe virtually the same conduct. The use in the penalty phase of both these special circumstance allegations thus artificially inflates the particular circumstances of the crime and strays from the high court's mandate that the state "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, at p. 428 [64 L.Ed.2d 398, at p. 406, 100 S.Ct. 1759].) The United States Supreme Court requires that the capital-sentencing procedure must be one that "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." (*Jurek* v. *Texas* (1976) 428 U.S. 262, at pp. 273-274 [49 L.Ed.2d 929, at p. 939, 96 S.Ct. 2950].) That requirement is not met in a system where the jury considers the same act or an indivisible course of conduct to be more than one special circumstance.

This conclusion has been reached in other jurisdictions that have considered the propriety of charging "overlapping" special circumstance allegations to crimes involving the same conduct or intent. For example, in *Provence* v. *State* (Fla. 1976) 337 So.2d 783, cert. den. 431 U.S. 969 [53 L.Ed.2d 1065, 97 S.Ct. 2929] (1977), the Florida Supreme Court considered application of the two aggravating circumstances of murder in the commission of a robbery (Fla. Stat., § 921.141(5)(d)) and murder for pecuniary gain (Fla. Stat., § 921.141(5)(f)). In rejecting the contention that both aggravating factors could be applied to a murder committed in the commission of a robbery, the court explained that while "in some cases, such as where a larceny is committed in the course of a rape-murder, subsections (d) and (f) refer to separate analytical concepts and can validly be considered to constitute two circumstances, here, as in all robbery-murders, both subsections refer to the *same aspect* of the defendant's crime. Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged." (337 So.2d at p. 786.)

Similarly, the Alabama Supreme Court has disallowed the use of both a capital felony committed during a robbery (Ala. Code, § 13-11-6(4)) and a

capital felony committed for pecuniary gain (Ala. Code, § 13-11-6(6)) as aggravating circumstances to a robbery-murder. The court held that in finding both aggravating circumstances, the trial judge "misconstrued the latter aggravating circumstance, in effect condemning Cook twice for the same culpable act—stealing money. Subsection 6 would, of course, cover a variety of crimes committed with the hope of financial benefit, ranging from 'murder-for-hire' to an heir killing his benefactor to gain his inheritance. But we do not think it appropriate to apply this aggravating circumstance to situations already condemned under subsection 4 which by definition involve an attempt at pecuniary gain. Thus, to avoid repetition, subsection 6 should not be applied to a robbery." (*Cook* v. *State* (Ala. 1978) 369 So.2d 1251, 1256.

The North Carolina Supreme Court has similarly limited the use of the aggravating circumstances of "avoiding or preventing lawful arrest," and that the " 'capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.' " That court held that submission to the jury of both aggravating circumstances on substantially the same evidence was improper, since it "amounted to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant." (*State* v. *Goodman* (1979) 298 N.C. 1 [257 S.E.2d 569, 587].)

These courts had a similar objective in limiting the use of overlapping aggravating circumstances—to guide and focus the jury's "objective consideration of the particularized circumstances of the individual offense" (*Jurek* v. *Texas, supra,* 428 U.S. at p. 274 [49 L.Ed.2d at p. 939]) so as to avoid unnecessary and prejudicial inflation of aggravating circumstances based on one aspect of the defendant's crime.

In each case, the goal is the same, to provide particular standards so as to avoid the risk of arbitrary and capricious infliction of the death penalty condemned by the United States Supreme Court.

The principles underlying California's prohibition of double punishment also support the conclusion that the charging of special circumstances should be limited in this case. ▮ Penal Code section 654[11] has been construed so as to "limit punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time, in

---

[11]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental." (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905] fn. omitted.) In determining whether section 654 is applicable, the initial inquiry is to ascertain the defendant's objective and intent. *(Id.)* ▮ In this case, it is clear that defendant and his companions had but one principal objective. As we have noted, the evidence supports the conclusion that the acts underlying the special circumstances were committed during one indivisible course of conduct undertaken to further a principal criminal objective, the robbery of Mr. and Mrs. Crumb. To accomplish that objective, defendant and his companions entered the apartment of the victims, committed the robbery, and murdered the victims to avoid detection. Were this not a case involving special circumstances, the prohibition against double punishment would be clearly applicable. ▮ "A series of criminal acts with the objective of robbery which results in both a robbery and a murder . . . of the same victim is within the rule of Penal Code section 654." (*People* v. *Lowe* (1975) 45 Cal.App.3d 792, 795 [119 Cal.Rptr. 699].)

The Attorney General argues that the finding of a special circumstance does not impose punishment, and therefore section 654 is inapplicable. In the words of the Attorney General, "[m]ultiple special circumstances have no greater effect than the finding of one special circumstance," because whether one or more special circumstance is found to be true, the effect is the same—to trigger a penalty hearing. But the Attorney General underplays the dual role of the special circumstance allegations in a capital case. Special circumstance findings are used not only to determine whether a penalty hearing will be held, but also as an explicit factor for the jury to consider in the penalty phase. As we have stated, former Penal Code section 190.3 specifies that "[i]n determining the penalty the trier of fact shall take into account . . . [t]he circumstances of the crime . . . and *the existence of any special circumstances found to be true* . . . ." Thus, the finding of more than one special circumstance has crucial significance in the penalty phase. Unlike cases where the punishment for multiple convictions is limited by a stay of sentence on the less severe offenses, no such limitation is possible where the jury determines the sentence and is instructed to consider the existence of *any* special circumstances found to be true. Although the finding of a special circumstance does not in itself "impose punishment," such a finding has a direct effect on whether the jury imposes the ultimate punishment. ▮ It is in this respect that the finding of multiple special circumstances based on an indivisible course of conduct violates the prohibition of Penal Code section 654.[12]

---

[12]Because defendant committed crimes of violence against different victims, he can be charged with two murders each carrying a special circumstance allegation. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].)

Having identified the problem created by charging multiple special circumstances, we must consider the appropriate procedure when defendant's single act or indivisible course of conduct constitutes separate substantive offenses which may form the basis for special circumstance allegations.

Several solutions have been suggested. First is the recommendation that in such cases the prosecution must make an election between the special circumstance allegations. Thus, in this case, the prosecution could charge either the burglary or robbery special circumstances, but not both. The prosecution, however, has the discretion to charge those offenses that are supported by the evidence, and it would be unfair to require that the prosecution guess which offense the jury will decide has been committed.

Another proposed solution is that in situations where the murder may have been committed during a burglary or robbery, the prosecution should charge those special circumstance allegations in the alternative. The prosecution may present evidence of either or both special circumstances, but the jury may choose only one. But, the jury must determine whether defendant committed the substantive offenses underlying the special circumstance allegations, and since in noncapital cases the jury could find that defendant committed both substantive offenses, it would be inconsistent for the jury to pick one or the other of these special circumstances at the guilt phase while concluding that defendant committed both substantive offenses. Moreover, it would be difficult if not impossible to instruct the jury how to rationally decide which special circumstance to choose.

 We conclude that the appropriate procedure would be to allow the prosecution to charge those special circumstances supported by the evidence, and for the jury to determine in the guilt phase which special circumstances may have been committed.

Assuming that overlapping special circumstances charged are found to be true, the doctrine of "merger" and the prohibition against multiple punishment should then operate in the penalty phase to prevent the improper cumulation of special circumstances to avoid the risk that a jury may give undue weight to the mere number of special circumstances found to be true. To avoid that risk, in those cases involving a single act or an indivisible course of conduct with one principal criminal objective, the jury should be instructed that although it found several special circumstances to be true, for purposes of determining the penalty to be imposed, the multiple special circumstances should be considered as one. In addition, the prosecution should be barred from referring to those multiple special circumstance findings which have been merged in the penalty phase. Such a procedure is necessary because of the dual nature of special circumstance allegations

provided by California's death penalty law coupled with the unique role of juries in determining the appropriate sentence in capital cases.

A similar problem is raised by the duplicative use of the "multiple murder" special circumstance in this case. In addition to the burglary and robbery special circumstances, defendant was charged with the "multiple murder" special circumstance (former Pen. Code, § 190.2, subd. (c)(5)) for each murder count. The multiple murder special circumstance is applicable where defendant has in the present or a prior proceeding been convicted of more than one offense of murder of the first or second degree. In this case, alleging this special circumstance with each murder count results in a finding of two special circumstances. ██ Since there must be more than one murder to allege this special circumstance at all, alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty, a result also inconsistent with the constitutional requirement that the capital sentencing procedure guide and focus the jury's objective consideration of the particularized circumstances of the offense and the individual offender. (*Jurek* v. *Texas, supra,* 428 U.S. at pp. 273-274 [49 L.Ed.2d at pp. 939-940].)

In our view, the appropriate charging papers would allege one "multiple murder" special circumstance separate from the individual murder counts. This procedure would properly guide the jury's objective consideration of the circumstances of the crime without hampering the prosecution's ability to seek what it considers to be the appropriate punishment.

7. *Issues relating to the penalty phase: Exclusion of defendant's poetry at the penalty phase.*

Defendant contends that, during the penalty phase of his trial, the court erred in excluding proffered evidence consisting of poetry written in appellant's handwriting that was relevant to mitigation. Respondent argues that the evidence was either irrelevant or was inadmissible hearsay. Respondent also contends that the evidence was cumulative and that its exclusion was not prejudicial.

The parties stipulated that the poetry was written by defendant while he was in custody in Colorado and before he was charged in California. The poetry, along with defendant's other personal effects, was seized by Kansas authorities under a search warrant when defendant was extradited to Kansas and was later obtained by defendant's counsel in discovery. During the penalty hearing, defendant's daughter testified that she and defendant had written poetry together while defendant lived with her, and that they exchanged poems by mail while he was in jail. Defendant then attempted to

introduce the poetry written in Colorado to demonstrate another dimension of his character, so that the jury could see him as a unique individual.

(a) *Relevance.*

Under California law the prosecutor and the defendant may present evidence at the penalty phase relevant to aggravation and mitigation, including evidence of the defendant's character, background, history, and mental condition. (Pen. Code, § 190.3.)[13] In addition, the federal Constitution requires that a defendant in a capital case be permitted to introduce any evidence relevant to his character or record as a mitigating factor. (*Lockett v. Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-112 [71 L.Ed.2d 1, 8-9, 102 S.Ct. 869]; *People* v. *Frierson, supra,* 25 Cal.3d 142, 178.) In *Lockett,* the United States Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (438 U.S. at p. 604 [57 L.Ed.2d at p. 990, 98 S.Ct. at p. 2964], fns. omitted, italics in original.)

In a capital case, the penalty jury "looks at the individual as a whole being and determines if he is fit to live." (*People* v. *Morse* (1964) 60 Cal.2d 631, 647 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) The scope of admissible evidence as to the defendant's character and background must therefore be very broad. (See, e.g., *People* v. *Nye* (1969) 71 Cal.2d 356, 371-372 [78 Cal.Rptr. 467, 455 P.2d 395], cert. den. 406 U.S. 972 [32 L.Ed.2d 672, 92 S.Ct. 2417].) Defendant asserts that his poetry is the type of matter that the jury must be permitted to consider because it illustrates a particular aspect of his character which makes him unique.

(b) *Hearsay.*

Respondent argues that the poems cannot be relevant unless they are offered to prove that defendant believes the sentiments expressed in them. Respondent contends that, if the poems are offered for that purpose, they are hearsay and therefore inadmissible under Evidence Code section 1200.[14]

---

[13]Section 190.3 provides, in part: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, . . . the defendant's character, background, history, mental condition and physical condition."

[14]Section 1200 provides: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

"(b) Except as provided by law, hearsay evidence is inadmissible."

Defendant contends that the poems are not hearsay because they are not offered to prove the truth of the matters stated in them.

Although the trial judge ruled that the poems were not hearsay, he refused to admit them on a ground essentially equivalent to the rationale of the hearsay rule—that they were offered as a means of testifying without submitting to cross-examination.[15] The judge was "troubled by the idea that [defendant] wrote them, with litigation pending, and it's a way of testifying, without testifying, really." ▮ A defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination. (*People* v. *Williams* (1973) 30 Cal.App.3d 502, 510 [106 Cal.Rptr. 324].)

Respondent argues that the poems were written for use in court, with the intent to communicate to a jury the implied statement that the poems express defendant's true thoughts and feelings.[16] The trial court, after reading the poems agreed, interpreting them as a "pitch for sympathy."

Defendant's purpose in offering the poetry is not entirely clear. Defendant's counsel argued at trial that the poetry was being offered in mitigation because it "allows the jury to see a person's particular facets or aspect of an individual which makes him unique, which makes him human, which stands him apart from his fellow human beings . . . ." Use of the poetry to show that he believed the sentiments expressed in the poems would constitute hearsay evidence. On the other hand, use of the poems to illustrate only

---

[15]Defendant's counsel offered to have defendant testify that he had written the poetry and testify as to where he had written it, but refused to allow the prosecutor to cross-examine on the content of the poetry.

[16]The proffered evidence consisted of seven pages of material in defendant's handwriting. The following excerpts illustrate their content:

". . . I know you're wondering/ Why I called/ But does it matter, any at all/ That I still love you, need you, & want you/ Most of all/ I'm soooo sorry for the wrong I done

". . . Why must we argue/ Why must we fight/ Cause after all/ We've seen the light/ We have each other/ We need no other/ So let's not argue/ And let's not fight . . . .

"The day we visited the Zoo/ They got cages/ For human beings too/ . . . So if & when my day arrives/ I might not want to go/ But one thing I can say for sure/ I won't have to worry/ About any of mankind/ Catching hell?/ Nor deal with/ Mans man made jails of hell?

"So I regret to cry/ And surely we all/ Eventually die/ What ever has occurred/ In my day's & time/ I feel sorrow for no wrongs/ And joyful for no rights/ I look at the things/ That have occured to me/ As/ Pure destiny/ That was already planned before my time/ . . . .

". . . I can't help but to feel, I have know [*sic*] pride/ Because in my heart/ I know I tried/ I have know [*sic*] one to answer to but myself/ But because I love & care for my family/ I must put their mind to rest/ When the man said I committed the crime/ I won't lie/ But the truth is/ That I was out enjoying myself/ Although some of these thing's you might find hard to believe/ Just remember this, just for me/ I sit in a cell/ Not knowing the limit of the time/ Just provide for the children give them love & treat them kind/ For one day I'll be coming home, it's just a matter of time/ I just hope I'll have a place in your arms? Everlasting mine."

that he was a sensitive individual who expressed his feelings in poetry, regardless of its content, would not make the evidence hearsay.

Even if the evidence is hearsay, there are two possible grounds for admitting it. First, defendant argues that the poems are admissible under the rule of *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. In *Green,* the United States Supreme Court held that, in the punishment phase of a capital case, a defendant's proffered evidence must be admitted if it is highly relevant and substantial reasons exist to assume its reliability, despite the fact that the evidence is inadmissible hearsay under state law. (442 U.S. at p. 97 [60 L.Ed.2d at p. 741, 99 S.Ct. at p. 2151].)

Second, the poems may come within the "mental state" exception to the hearsay rule. (Evid. Code, § 1250.)[17] Defendant does not raise this argument, but it seems clear that section 1250 could apply. If, as respondent argues, the poems were offered as evidence of defendant's true thoughts and feelings, they should be admissible under section 1250 unless they were written under circumstances indicating a lack of trustworthiness.

Both of these theories of admissibility require that the proponent of the evidence show that the evidence is trustworthy or reliable. The comment to section 1252 explains that "[i]f a statement of mental or physical state was made with a motive to misrepresent or to manufacture evidence, the statement is not sufficiently reliable to warrant its reception in evidence." (Evid. Code, § 1252, Cal. Law Revision Com., com. 29B West's Ann. Evid. Code (1966 ed.) at p. 283; Deering's Ann. Evid. Code (1966 ed.) at p. 214.) Again, the question is whether defendant wrote the poetry for the purpose of communicating a statement to a jury. If so, the exceptions cannot apply.

The circumstances surrounding the writing of the poetry by defendant in his jail cell militate against the possibility of a motive to manufacture self-serving evidence. Defendant's daughter testified that she and defendant had written poetry together while defendant lived with her, and that they exchanged poetry by mail while defendant was in jail. The poetry was seized by authorities when defendant was extradited to Kansas. Defense counsel only obtained the poetry through the discovery process. These facts

---

[17]Section 1250 provides that: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action . . . ."

Section 1252 imposes a limitation: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

do not warrant a conclusion that defendant wrote the poetry with a motive to manufacture evidence. We therefore conclude that substantial reasons exist to assume the reliability of the proffered poetry, and that the trial court erred in excluding it as mitigating evidence in the penalty phase of defendant's trial.

The judgment is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Bird, C. J., and Reynoso, J., concurred.

**GRODIN, J.**—With reluctance I concur in the judgment for reversal. The reasons for my reluctance, and my concurrence, I explain below.

I agree with Justice Broussard's plurality opinion that the defendant should be deemed to have established a prima facie case that he was deprived of his right under federal and state Constitutions to a trial by an impartial jury drawn from a fair cross-section of the community. As the dissenters observe, there are gaps in defendant's statistical showing; but given the differences in resources available to a defendant and the state, and in light of published studies which point to the exclusive reliance upon voter registration lists as a likely source of racial and ethnic disparity in the composition of juries, I am prepared to say that defendant's showing should be regarded as sufficient to trigger further inquiry.[1] It is about time, I think, that the problem be squarely confronted.

Were it up to me, however, I would not reverse the judgment on that account. In the trial court, both parties were operating without clear appellate guidance as to the applicable ground rules. Relying upon the trial court's determination that defendant's statistics failed to establish a prima facie case, the People presented no rebuttal evidence. I believe that consid-

---

[1] I do not agree with all of the reasoning in the opinion on this point. In my view, a defendant who challenges jury selection procedures on the basis of population statistics can at least be expected to refine those statistics on the basis of readily available census information reflecting the relative percentages of majority and minority populations over the age of 18. It does not appear, however, that consideration of such data would be fatal to defendant's prima facie case. According to 1970 census data figures, for example, the percentage of blacks in the over-18 population (9.4 percent) was only slightly less than the percentage of blacks in the population as a whole (10.8 percent). (1970 Census of Population, vol. 1, Characteristics of the Population, ch. B, General Population Characteristics (PC70-1-B6.) There may be merit also in the dissenters' view that the more appropriate focus for statistical analysis is the area within a 20-mile radius from the Long Beach courthouse, but the People did not challenge the statistics on that ground and this court has been presented with no basis for taking judicial notice of the geographical distribution of racial and ethnic populations within Los Angeles County. If my view as to the appropriate disposition were to prevail (*infra*) that would be a matter of inquiry upon remand.

erations of fairness and judicial economy require that it should now have opportunity to do so. Rather than permit defendant's conviction to disappear in a factual vacuum, this court, on the authority of Penal Code section 1260,[2] should remand for further evidentiary proceedings. Upon full consideration of relevant evidence it might be concluded that "no disparity of constitutional significance exists," or that "even with the use of multiple sources and all other practical means, a certain level of disparity is unavoidable," or that the underrepresentation which does exist is justified by a showing of overriding state interest. (Plurality opn., *ante*, p. 59.) In any of those events, the conviction could be affirmed without the necessity of further proceedings.[3]

If I were to insist upon the disposition I prefer, however, there would be no judgment of this court, since all three proposed dispositions are mutually exclusive and none would be supported by four justices. That, obviously, is an intolerable result. Since my view of the case is fundamentally incompatible with the disposition proposed by the dissent, I reluctantly join in the reversal of the judgment below.[4]

**MOSK, J.**—I dissent.

If some counties choose to use lists other than the voters' registration for selection of jury panels certainly they may do so. But is a county constitutionally compelled to do so, and if it does not, should its omission be

---

[2]Section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from . . . and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances." "[W]hen the validity of a conviction depends solely on an unresolved or improperly resolved factual issue which is distinct from issues submitted to the jury, such an issue can be determined at a separate post-judgment hearing and if at such hearing the issue is resolved in favor of the People, the conviction may stand." (*People* v. *Vanbuskirk* (1976) 61 Cal.App.3d 395, 405 [132 Cal.Rptr. 30]; *People* v. *Minor* (1980) 104 Cal.App.3d 194, 200 [163 Cal.Rptr. 501]; see also *People* v. *Brooks* (1980) 26 Cal.3d 471, 493 [162 Cal.Rptr. 177, 605 P.2d 1306].)

[3]It does not appear that there exists any reversible error in the guilt phase of defendant's trial. I express no opinion as to whether there might be reversible error in the penalty phase.

[4]See *Screws* v. *United States* (1945) 325 U.S. 91, 134 [89 L.Ed. 1495, 1520, 65 S.Ct. 1031, 162 A.L.R. 1330]. Justice Rutledge, after setting forth his views favoring affirmance of the conviction, stated: "My convictions are as I have stated them. Were it possible for me to adhere to them in my vote, and for the Court at the same time to dispose of the cause, I would act accordingly. The Court, however, is divided in opinion. If each member accords his vote to his belief, the case cannot have disposition. Stalemate should not prevail for any reason, however compelling, in a criminal cause or, if avoidable, in any other. My views concerning appropriate disposition are more nearly in accord with those stated by Mr. Justice Douglas, in which three other members of the Court concur, than they are with the views of my dissenting brethren who favor outright reversal. Accordingly, in order that disposition may be made of this case, my vote has been cast to reverse the decision of the Court of Appeals and remand the cause to the District Court for further proceedings in accordance with the disposition required by the opinion of Mr. Justice Douglas."

deemed justification for reversal of a conviction obtained on overwhelming evidence? Unlike the majority, I would answer those questions in the negative.

I pause at the outset to observe that the statistics upon which the defendant relies contain a major gap. Dr. Butler's survey revealed that of the *Long Beach* jury panels 5.5 percent were Black and 3.4 percent were Hispanic. He then takes a quantum leap to note that the estimated population figures for *Los Angeles County*—including persons who are under 18 and those who are aliens, legal and illegal—are 15 to 17 percent Black and 33 percent Hispanic in 1980.

The leading cases on the subject of jury selection (e.g., *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) require that a defendant be provided trial by an impartial jury drawn from a representative cross-section of the *community*. Our code uses the term "area served by the court" (Code Civ. Proc., § 197), not the county in which the court is situated. It takes only a cursory knowledge of the demography of Southern California to realize that Long Beach courts serve an area completely distinct in population characteristics from the totality of Los Angeles County. Indeed, Long Beach is closer to the county seat of Orange County (21 miles) than it is to the county seat of Los Angeles (23 miles). The defendant has produced no statistics relating to the ethnic composition of the community or area that is Long Beach, or from the supervisorial district in which the city is located (see Code Civ. Proc., § 206a). Figures for the entire County of Los Angeles are not only irrelevant but in this instance significantly deceptive.

On the more fundamental issue, I perceive no persuasive reason to prevent exclusive reliance on voters' registration lists. They are specifically authorized by Code of Civil Procedure section 204.7. These lists include persons who are citizens, of legal age, men and women; they represent all parts of the community, the area and the county; they are drawn from all economic strata, every occupation, all races, religions and political ideologies.

Citizens may become registered voters at no cost and regardless of their ethnicity or financial well-being. This can be said of no other available list. Telephone books? Installation and use of a telephone costs considerable money these days, and, in addition, generally only the so-called "head of the household" is identified. Automobile registration lists? Ownership of an automobile indicates a certain financial status, and here also, except in an affluent family, often only one owner per household is listed. Bank records, credit card lists, department store accounts, welfare rolls? All of these are

indicative of a certain economic status. Property tax rolls? Ownership of real property is limited to persons with resources. Income tax records? If the state were to permit their use, eliminated would be those whose income or exemptions required them to pay no tax.

There is even a $6 charge for one to obtain an identification card issued by the Department of Motor Vehicles pursuant to Vehicle Code section 13000 et seq., and $10 for a driver's license pursuant to Vehicle Code section 12800 et seq. The lists of such licensees and ID card holders shall be used by jury commissioners "to the extent that systems for producing jury lists can be practically modified, without significant cost" (Code Civ. Proc., § 204.7). There are two answers to the rejection of these lists in the instant case: first, there is no showing that in a large metropolitan area this can be done "practically" without duplication and without significant cost; second, the lists do not represent a cross-section of the community, but only those persons with the initiative, motive and financial ability to apply for the licenses or identification cards, an effort considerably more complicated and costly than registering to vote. No statistics have been offered to indicate minorities are better represented on such lists than on voter registration lists, and there is good reason to believe they are not.

In short, any list one can suggest implies an elite status or a certain economic class and in most instances eliminates those of marginal or limited income. Only the voters' registration permits all citizens over 18 to be listed at no cost whatever and with a bare minimum of effort. Indeed prior to each election the two major political parties, and most minor parties, conduct vigorous drives to encourage citizens—often minorities in particular—to register, and county registrars enlist hundreds of solicitors to be available on street corners and in shopping centers for that purpose.

Obviously citizens identified as being among the minorities cannot be coerced into exercising their civic duty to register and vote, but constant efforts are undertaken to persuade them to do so. Why minorities are said to be less interested than others in participating in the most important of the privileges of democracy is, if true, a mystery that requires more sociological and psychological study than can be undertaken with the superficial data offered in this case. In any event I suggest that any citizen—whether in the majority or minority population—who steadfastly ignores or avoids his simple civic duty to register and vote would be likely to ignore or avoid his more onerous civic duty to serve on a jury. And if he were by some means identified and reluctantly compelled to perform jury service he would in all likelihood not be a conscientious juror, a circumstance that might adversely affect a criminal defendant's right to be tried by a serious and objective trier of fact.

The majority opinion recites the evidence which overwhelmingly establishes this defendant's guilt. I would affirm the judgment.

Richardson, J.,* concurred.

**KAUS, J.**—I dissent from the plurality's view that this defendant has made out a prima facie case of having been deprived of a fair cross-section of the community. ██ ██ I agree, however, that there was error at the penalty phase. Therefore, if the disposition were up to me, I would have to struggle with the issue of prejudice.

For what they are worth, I shall briefly state my views on the cross-section issue.

The issue is, undoubtedly, one whose time has come. This case, however, is a poor trigger, mainly for the reason set forth in Justice Mosk's dissent: there is no showing that population figures for the whole of Los Angeles County are relevant with respect to a 20-mile radius from Long Beach. The fact that the People may not have stressed that point in their argument is neither here nor there: if the ruling of the trial court that no prima facie case has been established is correct, it is immaterial on appeal whether the proper basis was urged by the prevailing party. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 700 [159 Cal.Rptr. 684, 602 P.2d 384]; *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 511 [146 Cal.Rptr. 614, 579 P.2d 505].)

There is one additional quarrel I have with the plurality opinion: it seems to me that it dismisses much too cavalierly the argument that we should be looking at the original "contact pool," rather than the venire. It says that "[t]he panel which tried defendant was drawn from those jurors who appeared. The representative character of those jurors not of the 'original contact pool,' is the proper basis for comparison with the county population figures." (Maj. opn., *ante*, p. 53.)

Perhaps all that the plurality is saying is that the composition of the contact pool is not a necessary part of defendant's prima facie case. If so, I agree: given a prima facie case, let the People go forward and prove that the contact pool which resulted from the voter registration lists was properly balanced. What troubles me, however, is that the plurality seems to be saying more: that the composition of the contact pool is irrelevant. What if the contact pool had contained precisely the same percentages of Blacks and

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Hispanics as the population which Dr. Butler used as the basis of his testimony? Surely this would go a long way to vindicate voters' registration lists as a single source for prospective jurors, although it would, of course, make one wonder how all the Blacks and Hispanics got dropped between the first contact by the jury commissioner and the eventual assembly of the venires.

In any event, as a result of the plurality opinion the People will at some time be put to the burden of justifying the single-source procedure used to select prospective jurors. This is probably all to the good. If the method is unconstitutional, it ought to be flushed out. If it is not, the proof ought to settle at least this particular attack on the jury selection process.

Respondent's petition for a rehearing was denied June 20, 1984. Mosk, J., Kaus, J., and Lucas, J., were of the opinion that the petition should be granted.